William H. JOHNSON, John E. Jensen, Blaine C. Christeson, individually and

William H. Johnson, John E. Jensen, Blaine C. Christeson, Charles E. McCormick, James A. Guest, Orville Stiehl, Nelmar Zellmer, Edward L. Thompson, Arthur Thompson, Herbert Hertzler, and John E. Jensen and James A. Guest, Trustees under the will of Ray A. Thompson, deceased, Co-partners doing business as Huron Sales Company and Anderson Coach Company, a Michigan corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 18464.

United States District Court
E. D. Michigan, S. D.

April 25, 1960.

Madeline C. Dinu, Leroy G. Vandeveer, Vandeveer, Haggerty, Garzia & Haggerty, Detroit, Mich., for plaintiffs.

Fred W. Kaess, U. S. Atty., Willis Ward, Asst. U. S. Atty., Detroit, Mich., for defendant.

LEVIN, Chief Judge.

This is an action instituted by the plaintiffs under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) against the

defendant, the United States of America, for damages resulting from the crash of a Cessna 195 aircraft due to the alleged negligence of the crew of a B–47 bomber operated by the United States Army Air Force and the alleged negligence of employees of the control tower at Omaha Municipal Airport. If either the crew of the B–47 bomber or the personnel of the control tower were negligent, then the Government is answerable in damages. Eastern Air Lines v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62; Dahlstrom v. United States, 8 Cir., 228 F.2d 819.

On the morning of April 30, 1957 the Cessna, a single engine light aircraft owned by the Huron Sales Company, a subsidiary of the Anderson Coach Company, took off from East Tawas, Michigan on a business trip to Omaha, Nebraska. The plane was piloted by one of the plaintiffs, William H. Johnson, sales manager and partner of the Huron Sales Company. He was accompanied by two of the other plaintiffs, both executives of the Anderson Coach Company. The weather was excellent and flying conditions ideal. When the Cessna was over Atlantic, Iowa, about 45 miles and approximately 15 minutes flying time from Omaha, the pilot tuned into the radio frequency of the control tower of the Omaha Municipal Airport. At that time the tower was broadcasting the following message:

> "Attention all aircraft operating in the vicinity of the Omaha Airport, Air Force B–47 is executing practice ILS approaches to the air-

port. At present he reported procedure turn northwest of the field. Be alert to observe this aircraft."

When messages are transmitted by the tower, they are automatically recorded on a tape recording device, and this message was subsequently transcribed from the tape upon which it was recorded. The pilot of the Cessna received this message. In a statement given to the Civil Aeronautics Administration he said:

> "Shortly after calling the tower, I heard them giving instructions to another plane. Following this, I heard him [sic] mention that it was an Army B–47 making practice runs on the runway and that all aircraft should proceed with caution." [1]

When the Cessna was about seven miles east of the Omaha Airport, the pilot identified his flight and position to the tower and asked for wind velocity, altimeter setting and landing instructions. The control tower acknowledged this communication, gave him the information he requested and clearance to land on runway designated as 14-left.[2] Johnson, the pilot of the Cessna, then entered a traffic pattern for a landing and while in this traffic pattern he again communicated with the control tower and again was cleared to land on runway 14-left.

That morning United States Army Air Force B–47 bombers were practicing instrument low approaches, referred to as ILAS approaches, over that runway.[3] One of the B–47 bombers under the com-

---

1. At the trial the pilot of the Cessna testified that the broadcast referred to military planes making practice runs and did not specifically refer to a B–47, and that the reference in his statement to a B–47 reflected knowledge that he acquired subsequent to the broadcast. Actually, whether the broadcast referred to a B–47 or military aircraft generally is immaterial with respect to this controversy, but I do think that there can be no question in view of the tape recording of the broadcast introduced in the testimony that the message specifically referred to B–47 bombers.

2. The Omaha Municipal Airport at this time had two runways, 14-left and 14-right.

3. An instrument low approach system (ILAS) is a radar system that utilizes electronic instruments that act as a guide path so that aircraft may simulate landings at an airport. The practice maneuver is completed without any actual landing taking place. An ILAS approach over Omaha Municipal Airport is made over runway 14-left.

mand of Captain Leibrock had made three prior complete ILAS approaches. A fourth approach was discontinued upon instructions from the control tower in order to permit a Piper Cub aircraft, flying without radio, to land on runway 14-left. The pilot of this B-47, under proper instructions, was now proceeding to make his fifth approach over the same runway for which the Cessna had been cleared to land.

While in the traffic pattern one of the passengers in the Cessna spotted the B-47 and so informed the pilot of the Cessna who, upon making what he termed to be a spontaneous appraisal of the sighted plane, assumed the B-47 to be either a Constellation or a DC-7. When the pilot of the Cessna first sighted the B-47, the bomber was approximately three-fourths of a mile away from the Cessna and traveling in a southwesterly direction towards runway 14-left. The pilot of the Cessna then lost sight of the B-47 for seven or eight seconds. When the B-47 again came into view, the pilot of the Cessna recognized that what he first had mistaken for a Constellation or DC-7 was, in fact, a B-47 bomber and that the bomber was making an ILAS approach over runway 14-left.

The B-47 continued its practice maneuver, crossed the path of the Cessna at right angles, reached the boundary of the air field and continued over runway 14-left. The Cessna completed its turn so that it would be lined up with runway 14-left and proceeded to make its landing approach in the wake of the B-47. At a point about 800 feet from the approach end of the runway the Cessna crashed. It is the contention of the plaintiffs that the crash was caused by turbulence (a system of trailing vortices generated by the movement of heavy aircraft) created by the B-47.[4]

Plaintiffs contend that the captain in command of the B-47 Air Force

bomber was negligent in that he failed to break off the ILAS practice maneuver over runway 14-left despite the fact that he knew that the Cessna intended to land on runway 14-left and that he knew that to carry out the practice maneuver would create a turbulence hazard for the Cessna. This contention is without merit. A note to Sec. 60.14 of 14 Code of Federal Regulations (Air Traffic Control Rules) states that:

"The aircraft which has the right of way will normally maintain its course and speed, but nothing in this part relieves the pilot from the responsibility for taking such action as will best aid to avert collision."

The B-47 had the right of way since it was the plane on the right, 14 Code of Federal Regulations, Sec. 60.14(b); it was the heavier and therefore less maneuverable aircraft, 14 Code of Federal Regulations, Sec. 60.14(b); and it was the plane on final approach to land, 14 Code of Federal Regulations, Sec. 60.14(e). The evidence clearly establishes that there was no possible collision hazard between the B-47 and the Cessna. The B-47, therefore, had the right to maintain its flight course.

In addition, the B-47 was traveling in a predictable path, and the decision of the captain in charge of the plane to continue the ILAS approach was the safer maneuver for both the Cessna and the B-47. The pilot in command of the bomber had a right to take into consideration the fact that a pilot has the ultimate responsibility for the safe operation and landing of his plane, 14 C.F.R., Sec. 60.2; and that the pilot of the Cessna knew that turbulence is created in the wake of a B-47 bomber and would take such precautionary action as was necessary to land his plane safely.[5] The pilot of the Cessna had

4. Turbulence is also created by propellers and motors of an aircraft when the aircraft is on the ground. There is also a minimal amount of turbulence created by jet blasts. However, in this contro-

versy we are only concerned with the system of trailing vortices that travel behind heavy aircraft.

5. Aviation Safety Release No. 399, the subject of which is: Hazards to Small Air-

sufficient time to make any adjustments in its flight pattern with respect to a predictable path traveled by the B–47 that would insure the safe landing of his plane.

It is also the contention of the plaintiff that the employees of the control tower have a duty to determine the safe separation between planes so as to avoid the impact of turbulence.

It is the duty of the Civil Aeronautics Board to regulate air commerce "in such manner as to best promote its development and safety." 49 U.S.C.A. § 402. The Board is empowered to prescribe regulations to accomplish that purpose. 49 U.S.C.A. § 551. Section 617.4 of 14 Code of Federal Regulations defines the objective of the Air Traffic Control Service as follows:

> "The primary objective of the air traffic control service shall be to promote the safe, orderly, and expeditious movement of air traffic. This shall include: (a) Preventing collisions between aircraft and between aircraft and obstructions on the movement area. (b) Expediting and maintaining an orderly flow of air traffic. (c) Assisting the person in command of an aircraft by providing such advice and information as may be useful for the safe and efficient conduct of a flight. * * * "

While regulations have been issued by the Civil Aeronautics Board with respect to the separation of aircraft to avoid collision, regulations imposing a duty upon tower personnel to determine appropriate separation between planes to avoid hazards from turbulence have not been promulgated; but the failure to provide regulations does not excuse the Government if, in fact, such a duty did devolve upon the employees of the control tower.

Many variables such as wind direction, wind velocity, air currents, the weight and speed of the plane, and the technique of the pilot, all affect the creation, position, intensity and persistency, in point of time, of turbulence. Therefore, says the Government, it is impractical to impose a duty upon control tower personnel to determine the separation necessary to avoid the impact of turbulence upon planes following heavy aircraft. While the existence of these variables perhaps prevents the setting up of absolute limits for safe separation with respect to turbulence hazards, rough rules of thumb to determine such separation are available.[6] The fact that variables prevent the fixing of limits with certainty does not absolve the control tower from a duty to take the turbulence hazard into consideration, but this is merely one factor that may be considered in determining whether un-

craft Flown in the Wake of Large or Heavy Jet and Propeller Driven Aircraft, issued by the Civil Aeronautics Administration on December 19, 1955, embodies the following recommendations:

1. Pilots of small aircraft should be alert to observe and avoid the flight paths of jet aircraft. The time available for evasive action after a jet is first spotted is amazingly short.

2. Pilots of small aircraft should avoid following large transport-type aircraft, especially on landing approaches in calm air. Violent rolling tendencies which may become uncontrollable, and sudden losses of altitude and/or airspeed are possible in trailing vortices behind large aircraft, especially when they are at low airspeed.

3. Pilots should avoid crossing behind other aircraft, especially those flown at low speed. If trailing vortices are encountered, abrupt evasive maneuvering or violent pull-ups at high speeds can add materially to the structural load imposed by the gusts experienced.

4. There is little significant difference between the wakes of large propeller driven airplanes and those of large jet airplanes. The area aft of and just below the flight paths of both should be avoided.

6. See for example, "Theoretical Analysis Of Light Plane Landing And Take-Off Accidents Due To Encountering The Wakes of Large Airplanes," by Zegmund O. Bleviss; Report No. SM–18647, Santa Monica Division of Douglas Aircraft, December, 1954.

der a given set of facts the employees of the control tower did meet the standard of reasonable care. The Government also takes the position that to impose such a duty upon the control tower would impede the flow of air traffic. This argument, while it does have a surface plausibility, is actually without substance. The Government, in urging that the control tower does not have a duty to determine safe separation with respect to turbulence, asserts that such duty rests solely with the pilot of the following plane. The same delay in traffic would result whether the duty is imposed upon the control tower or the pilot of the plane. In any event, the safety of those using air lanes is not to be sacrificed to traffic expediency. I therefore hold that control tower employees, in the exercise of reasonable care, do have a duty to take into consideration turbulence hazards when giving clearance to land.

Since the control tower personnel, in failing to take into consideration the effect that the turbulence created by the B–47 would have upon the Cessna breached the duty owed to the plaintiffs, it now becomes necessary to consider whether the breach of this duty was a proximate cause of the crash.

The Federal Torts Claim Act, Title 28, § 1346 of U.S.C.A., provides that liability is to be determined "in accordance with the law of the place where the act or omission occurred."

The Municipal Airport Traffic Rules, enacted by the City Council of the City of Omaha, Ordnance No. 17383, Sec. 1–3.2(g) provides that "an aircraft approaching for a landing shall make a straight approach course for at least one-thousand (1,000) feet before crossing the airport boundary. * * *" It is not disputed that a pilot must, in entering his final leg from base leg, maintain an altitude of no less than 600 feet. The pilot of the Cessna testified that he performed the required configurations of the traffic pattern at Omaha.[7] However, the testimony of Emil W. Papke, a disinterested witness, a licensed pilot with fifteen years flying experience who had learned to fly at the Omaha Municipal Airport, and who had been a civilian flight instructor in military schools for two years—the only witness who observed the Cessna from the time it entered its base leg until the time it crashed—persuades me that the Cessna crashed by reason of the negligence of its pilot. On the day of the accident this witness was driving a tractor on his father's farm located approximately 400 feet from the northern boundary of the airport. He was about 1,000 to 1,200 feet from the edge of runway 14-left. He testified that he first saw the Cessna when it was between him and the airport boundary. His attention was focused on the Cessna because it was not flying in the normal pattern, and he thought the plane was in trouble. The pilot of the Cessna was flying below the required minimum altitude and, on its turn into final, the Cessna was inside the boundary of the field in violation of the Omaha City Ordnance No. 17383. The approach that the Cessna executed appeared to Papke to be practically a "suicidal approach".

The plaintiffs contend, however, that in written statements by this witness to the Civil Aeronautics Administration Tower Chief, Elmer A. Gerfen, and to Milton Schultz, of the Aviation Safety District Office located at the Omaha Municipal Airport, after the accident and his testimony on discovery deposition discredits his testimony given before me. While there is some variance between the testimony before me and the content of these statements and his testimony on discovery deposition with respect to

---

7. The established traffic pattern for landing for planes coming in from the east consisted of a downwind leg, where the plane would be flying parallel with runway 14-left in a northwest direction; a base leg where the plane would be flying perpendicular to the runway; and a final leg which would constitute the approach to land.

**494**

some details, there is nothing in the statements or in the deposition that in any material point negates his testimony given at the trial. His failure to include in such statements some of the details elicited at the trial is explained by him—

"I am a pilot myself, and this man, I figured, had enough trouble without a violation being filed against him for flying at a low altitude in a poor traffic pattern. That is the reason I held back."

He impressed me as a credible witness. That the Cessna did not execute the proper traffic pattern is also substantiated by the testimony of the Air Force trainee employed in the control tower who was in communication with the pilot of the Cessna and who gave him the clearance to land.

I find that the crash of the Cessna was caused solely by the negligence of the pilot of the Cessna and, therefore, the plaintiffs have no cause of action.