Florence Wattles **HARTZ**

v.

**UNITED STATES of America.**

Margaret Elwyn **ROTH**

v.

**UNITED STATES of America.**

**GLOBE INDEMNITY COMPANY**

v.

**UNITED STATES of America.**

Civ. A. Nos. 8139–8141.

United States District Court
N. D. Georgia,
Atlanta Division.

Dec. 29, 1965.

Smith, Swift, Currie, McGhee & Hancock, Atlanta, Ga., Martin, Tate & Morrow, Memphis, Tenn., for plaintiff Hartz.

Smith, Swift, Currie, McGhee & Hancock, Atlanta, Ga., Prewitt & Bullard, Vicksburg, Miss., for plaintiff Roth.

Smith, Swift, Currie, McGhee & Hancock, Atlanta, Ga., for plaintiff Globe Indemnity Co.

Charles L. Goodson, U. S. Atty., Atlanta, Ga., Philip Silverman and Wallace E. Maloney, Civil Division, Dept. of Justice, Washington, D. C., for defendant United States.

MORGAN, Chief Judge.

These were actions brought under the Federal Tort Claims Act, 28 U.S.C., Section 1346(b), to recover damages for the deaths of William B. Hartz and Harold S. Roth, and for property damage to the Bonanza airplane, in which both were occupants, which occurred when it crashed on take-off. These three actions were consolidated for trial and heard before this Court without a jury.

At approximately 7:00 P.M. on Friday, November 10, 1961, a Beech Bonanza N–7996D requested clearance to make an intersection take-off on Runway 27 at the Atlanta Municipal Airport. The Bonanza was first cleared to the intersection by

a Ground Control controller, taxied there and took its position in the intersection, facing the runway. Other commercial aircraft were waiting for take-off at the end of the runway. While waiting there, an Eastern Air Lines DC–7, known as Flight 131, took off along Runway 27, from the end of the runway, passing the intersection in front of the Bonanza, waiting for its take-off clearance. The Bonanza was then cleared into position and requested to hold at the intersection. After Flight 131 had passed down the runway, the local controller, one John H. Dillworth, an employee of the Federal Aviation Agency, issued the Bonanza a clearance for take-off, by clearing the Bonanza in the language "November 96 Delta cleared for take-off, watch the prop-wash". The Bonanza acknowledged the clearance and commenced its take-off roll from the intersection. Shortly after take-off, witnesses saw the lights of the Bonanza apparently wobble in the air; the Bonanza then crashed on the runway after having achieved a height of 50 to 75 feet, and skidded and came to rest off the runway. Both the pilot and the passenger on the Bonanza died in or as a result of the wreck, and, since no eye witnesses actually saw the plane crash, it is difficult to ascertain what caused the crash.

Plaintiffs claim that the Bonanza crashed because it was caught up in the right wing-tip vortex of the preceding Eastern Air Lines Flight 131, which would not have happened if Controller Dillworth had allowed sufficient separation between said Flight 131 preceding it, and the Bonanza, at the time the Bonanza was cleared for take-off. Plaintiffs claim further that the controller violated a provision of his procedure manual, which provided for the separation to be maintained or, in the alternative, a common law duty.

Defendant denies there was any violation of the procedure manual, or that the separation effected was improper; or, further, that any act or omission on the part of the controller, or any other employee of the United States, was responsible for the crash of the Bonanza.

Defendant denies further that the crash was caused because of wing-tip or vortex turbulence. In any event, defendant contends that it was the negligence of the pilot which was wholly and solely responsible for the crash and the resulting deaths of William B. Hartz and Harold S. Roth, and the loss of the Bonanza.

The first question to be determined by this Court is the cause of the crash of the Bonanza N–7996D.

The crash of the Bonanza occurred on Runway 27 of the Atlanta Municipal Airport. Runway 27 is 7,860 feet in length. Eastern Air Lines Flight 131, a DC–7, began its roll for take-off at the eastern threshold of the runway in question. Captain Ashley, pilot of the DC–7, estimated his lift-off at 2600 to 2850 feet from the roll-off point. Mr. Hartz, piloting the Bonanza, requested clearance from the control tower at an intersection on Runway 27 2,160 feet west of the runway eastern threshold. By a timing of a re-recording of the original tower tapes, the time which elapsed between the take-off clearance to Eastern 131 and the Bonanza was 43 to 46 seconds. The DC–7 passed the intersection where the Bonanza was awaiting clearance, and at a point approximately 500 feet west from said intersection, the DC–7 became airborne.

After receiving its take-off clearance, the Bonanza initiated its take-off roll and became airborne after approximately 1300 feet. This was in the vicinity of the intersection of Runway 27 with Runway 21, the northeast-southwest runway. Following its lift-off, Controller Stoddard, at the Atlanta Air Tower, who had accumulated 800 hours as pilot of a Bonanza, observed the Bonanza to follow a normal take-off pattern, and the Bonanza flew in a straight and level flight before any irregularity was noted. Immediately following the take-off, the lights of the Bonanza were observed to "wobble" and this was observed by both Controller Dillworth and Stoddard. Imme-

diately thereafter Controller MacDonald saw sparks going down the runway made by the impact. Hartz and Roth died in or as a result of the crash on November 10, 1961. Just prior to the crash, the witnesses in the control tower noted the green right wing-tip light assumed a higher position than the white tail light, and the red left wing-tip light was thereafter seen by Dillworth. The evidence from the tower observers was that the plane Bonanza rolled completely over.

■ Following the crash, the Civil Aeronautics Board, through its air safety investigator, John H. King, conducted an investigation, and from the physical facts found there was no evidence of any engine or structural failure of the aircraft nor of any occurrence of a stall. The control instruments settings in the Bonanza after the crash indicated that the settings were correct and proper settings for a Bonanza while initiating take-off roll and take-off. The evidence indicated that the Bonanza crashed in an inverted position. Experts testified that a Bonanza aircraft, at an altitude of 50 to 70 feet and an air speed which it would normally assume would have insufficient roll capabilities, through the use of the controls in the cockpit, to become inverted prior to striking the ground, and that an altitude of 200 feet or more would be required to invert the aircraft prior to its striking the ground. Hence, even if Hartz had tried, he could not have caused the Bonanza to become inverted prior to its impact with the ground through the use of controls available to him. Experts testified that under the circumstances the Bonanza could not have stalled. The various experts testified that the engine of the Bonanza was under high R.P.M.'s, developing high power on impact, as evidenced by the bends in the propeller blades. The engine failure was further ruled out by evidence that the parallel grooves or gouge marks found on the runway were made by the propeller, and that the engine of the Bonanza had to be developing power at the time of impact for the propeller to have gouged as deeply into the concrete as it did. Experts dismissed the possibility of a stall having occurred, saying the Bonanza would have "rolled up in a ball" on the runway had a stall occurred, rather than moving 183 feet in a lateral direction.

According to Dr. Barnes Warner McCormick, Jr.,[1] a vortex is created when the wing of an aircraft in flight sheds a horizontal sheet of air in its wake which quickly rolls up into what has been described as a "horizontal tornado". The right wing-tip vortex rotates counter-clockwise looking forward along the line of flight of the aircraft shedding the vortex. The vortex contains a core, at the edge of which is found the maximum force of the vortex. The forces on the right side of the core, again looking forward, are upward while those to the left are downward. Hence, an aircraft flying along the axis of the core would encounter "up forces" on the right wing while the left wing would encounter "down forces", thereby creating a rolling effect to the left. The force of this rolling effect would be determined by the velocity of the vortex. Vortices created at altitude are known to descend at an ascertainable rate to some distance above the ground, in this instance approximately 46 feet, at which point their movement becomes primarily outward rather than downward. Their lateral movement is dictated in part by the random movements of the wind. Hence, it is possible that a cross wind to the left could slow up the lateral movement to the right of a right-wing vortex, simply hold it stationary, or even blow it to the left, depending upon the strength and exact direction of the cross wind. The vortex system dissipates gradually

1. Dr. McCormick has worked with trailing vortex systems since 1952, and wrote his doctorate dissertation on this subject. He recently has completed a sizeable job for the Vertol Division of the Boeing Company concerning the vortex system of shed-off. He served as chief of aerodynamics with that concern for 2½ years. In 1958 he was head of the Department of Aeronautical Engineering at the University of Wichita.

over a period of time, some having been observed to linger as long as three or four minutes, and it is undisputed that "encounters with trailing vortices will produce uncontrollable rolling movements in a light aircraft". Dr. McCormick testified that, in his opinion, "the crash was caused by interference between the Bonanza and * * * the trailing vortex shed from the right wing of the DC–7".

Col. James N. Peyton,[2] Chief of the Investigation Division of the Civil Aeronautics Board from 1951 until August, 1960, testified that he had investigated several hundred aircraft accidents while employed by the Investigation Division of the Civil Aeronautics Board.

Colonel Peyton, after being asked to assume certain facts previously proved during the trial, and after being shown the fifteen photographs of the wreckage surroundings made by Investigator King during his investigation, stated that, from his detailed study of said photographs and his own experience, in his opinion, the cause of the crash of the Bonanza was "the Beechcraft suddenly and without warning came into contact with wing-tip, with terrific wing-tip turbulence created by the preceding aircraft, the DC–7. This violent vortex turbulence caused the Beechcraft to roll violently to the left out of control and crash onto the runway in an inverted attitude".

From the physical evidence found at the scene by Aeronautics Board Safety Investigator King, and based on the testimony of Professor McCormick and Colonel James N. Peyton, this Court finds that the crash of the Bonanza was caused by the interference between the Bonanza and the trailing vortex shed from the right wing of the Eastern Air Lines DC–7.

After determining that the trailing vortex from the right wing of the Eastern DC–7 caused the crash of the Bonanza, the next issue confronting this Court is whether the crash was the proximate result of any negligence on the part of the defendant or its agent, Controller Dillworth, or whether the crash was proximately caused by the negligence of the pilot of the Bonanza N–7996D.

In the recent case of Franklin v. United States, C.A. 7, 1965, 342 F.2d 581, the Court of Appeals for the Seventh Circuit discussed the standards of negligence to be applied in Federal Tort Claims Act cases arising out of alleged negligence of tower personnel, and stated as follows:

"The findings of the District Court must be considered in the light of the general principles of negligence applicable to air traffic control. In the absence of a special statute, the ordinary rules of tort law apply to aircraft accidents. United States v. Miller, 9 Cir., 303 F.2d 703."

There was placed into evidence the Air Traffic Control Procedures manual, designated as ATM–2–A Manual. This manual, which was in full force and effect on the date of the crash, sets forth the procedures used by the controller in connection with his regular duties. Thus, in order to show negligence on the part of the defendant, the plaintiffs are required to show that any duty owed by the controller to the Bononza was in fact spelled out by the standards and procedures contained in the Air Traffic Control manual, and was in fact breached.

Plaintiffs also claim a common law duty separate and apart from the duty as covered by the manual of procedures. However, there is no such duty

2. Before becoming chief of the Investigation Division of the Civil Aeronautics Board in 1951, Col. Peyton was a test pilot with the United States Department of Commerce, where he tested small aircraft to large transport type with newly designed aircraft structure, an air line pilot with TWA and Canadian Colonial Airways, and was commanding officer of the B–29's that destroyed Japan's oil refineries. During his activities as an aircraft pilot for 33 years, he logged in excess of 10,000 flying hours as pilot in charge of aircraft.

independent of the duty created by the procedures manual, since the Georgia Legislature has adopted federal aviation practices and procedures as its own,[3] and the standards of conduct as determined by the Civil Air Regulations and other prescribed rules would govern, in accordance with other rules of law applicable to torts on land.[4]

■ Clearly, the procedures governing controllers and the Civil Air Regulations governing pilots set forth the prevailing standard in the State of Georgia. The applicable law under the Federal Tort Claims Act, 28 U.S.C., Section 1346 (b), is that of Georgia. Although it does not have Civil Air Regulations of its own, because the United States has pre-empted the field, Georgia has provided that in aviation matters, the policies, principles, and practices followed by the United States shall be followed. Georgia Code Annotated Section 11–110.

■ Plaintiffs' main allegation of negligence is that Controller Dillworth issued the Bonanza a clearance for take-off when there was insufficient separation between the Bonanza and Eastern Flight 131 which preceded it. Plaintiffs contend that Dillworth failed to wait until the DC–7 passed over the end of the runway, thus violating the provisions of the manual governing separation standards.

As above stated, the measure of the duty is to be governed by the provisions of the procedures manual governing the activities of the controllers. The standard of separation for two departing aircraft is contained in Section 422.2 of the Air Traffic Control Procedures Manual.[5] The important element of separation from the preceding aircraft is its crossing the end of the runway; the separation between the two departing aircraft is not measured in terms of time, nor is there any element requiring specific distance. It is also plain that the element of crossing the end of the runway by the preceding aircraft is not related to the time the clearance is given to the second aircraft. The separation requirement is merely that when the second aircraft has started its take-off roll, the first aircraft should have crossed the far end of the runway.

The ultimate question to be determined with regard to the separation of these two airplanes is: Where was the DC–7 at the time the Bonanza began its take-off roll?

Controller William O. Cooper, who was in charge of the Ground Control in the Atlanta Tower at the time of the crash, testified that the DC–7 was in the position west of the western end of Runway 27 when the Bonanza began to roll. Controller Dillworth also testified that the DC–7 had passed the western end of the runway at this time. These were the only two eyewitnesses to the separation. While it is true that plaintiffs contend otherwise, based on the calculations of Professor Dutton, a Professor from the School of Aerospace Engineering at Georgia Tech, this Court finds that there were too many variables and estimates upon which Professor Dutton made his calculations to controvert the direct testimony of Cooper and Dillworth of the position of the DC–7 at the time of the roll-off of the Bonanza. Even the recorded tape

3. Sec. 11–110, Georgia Code Annotated.
  "11–110. *Federal law followed.*—It is hereby declared that the intent of Chapter 11–1 is to coincide with the policies, principles, and practices established by the United States Air-Commerce Act of 1926, and all amendments thereto."

4. Sec. 11–107, Georgia Code Annotated.
  "11–107. *Liability to passengers; rules for determination.*—The liability of the operator of an aircraft carrying passengers, for injury to or death of such passengers, shall be determined by the rules of law applicable to torts on land arising out of similar relationships."

5. Sec. 422.2—Air Traffic Control Procedures Manual.
  Between departing aircraft, sufficient separation so that:
  THE PRECEDING AIRCRAFT HAS EITHER CROSSED THE OPPOSITE END OF THE RUNWAY OR TURNED AWAY FROM THE PROJECTED PATH OF THE SUCCEEDING AIRCRAFT BEFORE THE LATTER BEGINS TAKEOFF RUN.

verifies this position of the two airplanes. It is clear from the record that the Bonanza could not have been cleared for take-off position at the intersection until after the DC-7 passed the intersection 2160 feet west of the east threshold of Runway 27. The testimony at the trial indicates that there was a time of approximately five seconds between the time that the clearance was given before the actual roll-off begins for both the DC-7 and the Bonanza airplane. The tape further reveals that five and one-half seconds after take-off clearance was given to the Bonanza, Controller Dillworth gave the DC-7 instructions to contact Departure Control. The testimony was that the directions were given to contact Departure Control at the time the DC-7 was over the center marker, which marker was approximately one-half mile west of the western end of Runway 27. This would place the DC-7 approximately one-half mile west of the western end of the runway at the time the Bonanza began its roll-off. This tends to verify the oral testimony of Cooper and Dillworth that the DC-7 had cleared the runway at the time the Bonanza was given clearance for take-off by Dillworth in the tower.

■ The plaintiffs have the burden of affirmatively showing a breach of the duty by a preponderance of the evidence, but it appears to this Court that the separation effected was in accordance with that required by the procedure.

■ Plaintiffs contend that Controller Dillworth should have delayed the take-off clearance so as to permit the ·vortex turbulence to dissipate. However, the ultimate responsibility for the take-off at that or any other time rests with the pilot; the pilot, not the controller, was in the position to delay his take-off if he felt it would be to his benefit to do so.[6] The main responsibility for the safe conduct of an aircraft in the control zone under Visual Flight Rule conditions rests with the pilot of each aircraft. See Johnson v. United States, D.C., 183 F. Supp. 489; Wenninger v. United States, D.C., 234 F.Supp. 499; United States v. Schultetus, 5 Cir., 1960, 277 F.2d 322.

■ As has been stated in several similar cases, the pilot, after his clearance has been given for take-off, remains primarily responsible for the movement of his aircraft. In this case, decedent Hartz was required to follow his clearance, not blindly, but correlative with his duty to exercise care for his own safety from everything of which he was aware. The theory asserted by plaintiffs' counsel would place upon the operators of control towers the primary responsibility for the operation of aircraft at the field. Governmental regulations, having the force of law, have assigned this responsibility to the operators of aircraft.

■ The evidence indicates that information had been issued prior to 1961 in various publications to which Hartz subscribed[7] concerning the effect of turbulence generated by large multi-engine or jet aircraft. Hartz was an experienced pilot with 2300 hours of flight time. The partnership of Markwell and Hartz had owned three airplanes, a Bonanza before this one. Immediately prior to the crash, Hartz had been in Atlanta Airport at least three times during the two weeks preceding the crash. The recorded tape indicated how busy the Atlanta Airport was at this time of day.

6. Part 60 of the Civil Air Regulations (14 C.F.R. 60) in effect on November 10, 1961:
   *Section 60.1 Scope*
   The air traffic rules in this part shall apply to aircraft operated anywhere in the United States * * *
   *Section 60.2* AUTHORITY OF THE PILOT.
   The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft. * * *

7. The partnership of Markwell and Hartz was a member of AOPA and received the organization's publication "The Pilot"; also subscribed to "Flying Magazine" and the "Airman's Guide". Also, the Bonanza Pilot's Handbook, which was available with the Bonanza, warned the pilots of the turbulence created by multi-engine planes.

Although Controller Dillworth warned only of prop-wash,[8] information concerning various type turbulences created by large multi-engine planes had been well tabulated in the publications available to Hartz in the immediate years preceding the date of the crash, and this warning from the tower certainly should have made the Bonanza pilot cognizant of all types of turbulence. So that once having knowledge of the possibility of the existence of turbulence, it became the responsibility of the pilot to conduct the take-off in the safest possible manner. See United States v. Miller, C.A. 9, 303 F. 2d 706, 709–710; United States v. Schultetus, supra.

■ Although plaintiffs' main claim of negligence has been the failure to maintain adequate separation, it should be remembered that Hartz' request for an intersection take-off contributed to a substantial shortening of the runway distance between himself and the preceding aircraft. Thus, instead of 7,860 feet, which would have been available, there was but 5,700 feet, but Hartz elected to take the intersection take-off. Dr. McCormick, who was also a pilot, indicated that if he was taking off behind a DC–7, he would want to go to the end of the runway instead of taking off from an intersection. Other expert evidence presented indicates that all agreed that it would have been better for the Bonanza to taxi to the end of the runway, instead of taking off from an intersection.

Certainly an intersection take-off, per se, is not an illegal or improper act, but in this case it must be considered as an act of negligence in the light of Hartz' knowledge that there were other large aircraft waiting for take-off, and that the DC–7 passed directly in front of him at the intersection of this particular runway.

For the reasons stated above, this Court finds that the crash of the Bonanza was not caused by any act of negligence on the part of the defendant or any of its agents, but was caused solely by the negligence of the pilot of the Bonanza and, therefore, the plaintiffs have no cause of action against this defendant.

This opinion is adopted by the Court as the Findings of Fact and Conclusions of Law as provided by Rule 52(a), Federal Rules of Civil Procedure.

It is so ordered.

---

8. ATM–2–A Manual, 439.18, provides:
"To issue cautionary information regarding possible rotorcraft downwash, thrust stream turbulence, and/or wing-tip vortices:

CAUTION, TURBULENCE (traffic information).
*Example:* CAUTION, TURBULENCE, DEPARTING AMERICAN ELECTRA."