**Thomas G. SOMLO, and Progress For Vending, Inc., a corporation,**

**and**

**The Exchange National Bank of Chicago, as Administrator of the Estates of Ginette Somlo, deceased, and Susan Michelle Somlo, deceased, and The Exchange National Bank of Chicago, as Guardian of the Estate of Terri Lynn Somlo, a minor, Plaintiffs-Appellants,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 16717.**

United States Court of Appeals Seventh Circuit.

Sept. 10, 1969.

As Modifed on Denial of Rehearing Nov. 5, 1969.

Donald J. Parker, Walter H. Moses, Jr., Frank J. McGarr, Chicago, Ill., for plaintiffs-appellants.

Thomas A. Foran, U. S. Atty., Chicago, Ill., William D. Ruckelshaus, Asst. Atty. Gen., John J. Eldridge, Robert E. Kopp, Robert V. Zener, U. S. Dept. of Justice, Washington, D. C., for defendant-appellee.

Before KNOCH, Senior Circuit Judge, and FAIRCHILD and KERNER, Circuit Judges.

KNOCH, Senior Circuit Judge.

Plaintiffs-Appellants, Thomas G. Somlo and Progress for Vending, Inc., brought suit under the provisions of the Federal Tort Claims Act, Title 28 U.S.C. § 1346(b), charging that government employees were negligent in carrying out their duties with respect to a Cessna 310 Twin-Engine light aircraft, Registration No. N5338A, piloted by Mr. Somlo, and owned by Progress for Vending, Inc., as a proximate result of which the aircraft crashed.

The District Court granted the petition of Progress for Vending, Inc., an Illinois corporation and Progress Food Specialties, Inc., an Illinois corporation, for the use of The Home Indemnity Co. as successor to the Springfield Insurance Co., to intervene as plaintiffs.

The Exchange National Bank of Chicago, as Administrator of the Estates of Ginette Somlo and Susan Michelle Somlo, passengers who were killed in the air crash, and as Guardian of the Estate of Terri Lynn Somlo, a minor, another passenger who was injured in the crash, also brought suit against the United States of America, which was consolidated with the first action.

The other passengers, Mrs. Somlo's mother and a maid who were both killed in the crash, are not involved in this action.

The District Judge tried the issue of liability separately and found adversely to plaintiffs that the pilot's negligence was the proximate cause of the crash, thus foreclosing recovery from the government by any of the plaintiffs. The plaintiffs' appeal followed.

The District Court heard extensive evidence and made comprehensive findings of fact resolving several crucial disputed issues.

Plaintiff Thomas G. Somlo had for many years held a commercial pilot's certificate to fly single engine aircraft. He was not at the time of the flight in question authorized to carry passengers in a multi-engine plane but the District Court expressly found that Mr. Somlo's lack of a multi-engine rating was irrelevant except with reference to evaluating his credibility. In December, 1963, Mr. Somlo did get a multi-engine rating. Investigation of this accident by the Civil Aeronautics Board resulted in an order suspending Mr. Somlo's license for six months. That order was affirmed by this Court in Somlo v. Civil Aeronautics Board, 1966, 367 F.2d 791.

Mr. Somlo testified that about 9:00 A.M. CST, on January 2, 1963, he and the five persons who accompanied him on the flight left Naples, Florida, on a flight to O'Hare Airport, Chicago, Illinois, which was the home base of the aircraft and the place where Mr. Somlo had left his automobile. Prior to departure, Mr. Somlo said he telephoned Fort Myers, Florida, Weather Bureau Station and was told the weather along his route was such that the craft could be flown visually without instruments. He was cautioned that it was snowing in Chicago and that instrument flight conditions were in effect but that the snow was expected to stop early in the afternoon to permit landing under visual conditions at the estimated time of arrival about 4:30 P.M.

While in flight, Mr. Somlo requested weather information from the Tampa, Florida, and Atlanta, Georgia, Flight Service Stations and received essentially the same data.

Chester D. Ridgeway, an air travel control specialist-general, employed by the Federal Aviation Administration at Washington, D. C., testified concerning the records of the contact at Atlanta and the weather reports available at that time. He said the aircraft contact report indicated that the pilot requested Chattanooga, Bowling Green, and Chicago weather and the terminal forecast for the Chicago area. For Chicago the report was temperature 29, with snow ending around 3:00 P.M. and beginning again about 6:00 P.M.

The aircraft landed at Chattanooga, Tennessee, about noon EST, and before taking off again the pilot personally checked the weather at the Chattanooga Airport. It was still snowing at O'Hare with instrument conditions and skies expected to be overcast but with visual flight conditions by the time of Mr. Somlo's arrival.

At about 2:35 P.M. CST, Mr. Somlo radioed Bowling Green, Kentucky, Flight Service Station for the weather en route and at Chicago. Loy C. Hamm, air traffic control specialist employed by the Federal Aviation Agency at Bowling Green, testified that he was contacted by aircraft N-5338 Alpha (the registration number for the aircraft in question here) and gave the requested weather reports for Evansville, Terre Haute, Indianapolis, and O'Hare, Chicago, the designated destination, which last included light snow grains, temperature 31 degrees and dew point 26. The forecast for O'Hare, issued 12:40 P.M. CST, predicted ceiling 500 overcast, visibility 5 miles, light snow and smoke until 2:00 P.M. CST (which would be instrument conditions) then scattered clouds, visual conditions and overcast till 6:00 P.M. with light snow resuming then.

A primary conflict in the testimony concerned the vital issue whether Mr.

Hamm also gave Mr. Somlo a light aircraft weather advisory issued at 1:25 P.M. CST "Advisory Delta" which was pertinent for the period from 1:25 to 5:25 P.M. CST and which included a warning of local moderate icing in clouds and precipitation over Wisconsin, northern Illinois, the southern ⅔ of Lake Michigan and the north ⅓ of Indiana, and further cautioned against occasional light snow or freezing drizzle in northwestern Wisconsin and locally over northcentral and northeastern Illinois, with a ceiling below 1000 feet and visibility below two miles in fog.

Mr. Ridgeway testified that this advisory should have been given to Mr. Somlo at Bowling Green and at Lafayette Flight Service Stations, but that so far as his investigation disclosed the Lafayette station did not give the advisory.

Mr. Somlo testified that when he called the Lafayette Flight Service Station (at 3:55 P.M. CST according to the records) he requested current weather for Lafayette and Chicago and was given just that with no mention of the Advisory Delta or an amended forecast.

Mr. Somlo also testified repeatedly that he was not given the Advisory Delta at Bowling Green either, contrary to Mr. Hamm's testimony that he was. The Advisory Delta, plaintiffs' exhibit #1, bears the number "N-5338 A" which Mr. Hamm testified he entered in his own handwriting immediately after the contact with Mr. Somlo's aircraft. He testified that he knew he had given the pilot the report because he wrote the aircraft number on the report itself, which was his normal procedure. The number also appeared on other reports which Mr. Hamm testified he had read at the time to Mr. Somlo.

The District Judge considered the conflicting evidence on this crucial point and he found no reason to disbelieve Mr. Hamm or to conclude that the number of Mr. Somlo's aircraft had been added to the Advisory after the crash. He based his conclusion not only on Mr. Hamm's

long and good record with the Federal Aviation Agency but on his own observation of the witnesses at the trial. Issues of credibility are to be resolved by the Trial Court before whom the witnesses appear. Century Indemnity Co. v. Serafine, 7 Cir., 1963, 311 F.2d 676, 679; Pollice v. Hartford Fire Insurance Co., 7 Cir., 1965, 355 F.2d 524, 526.

Mr. Ridgeway testified that it was standard operating procedure to jot down aircraft numbers on the face of advisories to indicate that they had been given. We do not find it significant in the circumstances that while other reports bear several aircraft numbers, only this one number appears on Advisory Delta, as Mr. Hamm also testified that no other Chicago-bound aircraft contacted him that afternoon to his recollection. Nor do we find convincing evidence that Advisory Delta was not given in the fact that it is not noted on the Flight Contact Sheet. Mr. Ridgeway testified that the regulations were not specific as to what was to be recorded in the various spaces of the Flight Contact Sheet Form. He testified further that the space on the form for "clearances and advisories" referred to air traffic clearances and/or advisories and not to weather advisories.

Plaintiffs' Exhibit #31 was a telegram sent by another employee at the Bowling Green station (in response to a request for information from the Federal Aviation Agency) which did not mention Advisory Delta's having been given. Mr. Hamm testified that he did not know of this telegram till after it had been sent and that he disagreed with its contents. The District Court studied allegedly impeaching statements in a prior deposition taken from Mr. Hamm and found that the statements in the deposition were not in fact impeaching.

Mr. Somlo explained that he told Lafayette Station that he was not carrying "passengers" without being asked because he was distinguishing the flight as non-commercial. He asserts that there was no testimony that he was actually asked how many "persons" were aboard. He argues that pertinent regulations call for inquiry as to number of persons on board for international flights only. Plaintiffs' Exhibit 19, the flight plan made out for Mr. Somlo at Lafayette, shows item #17 "no. of persons aboard—1". Plaintiffs contend that the District Judge improperly assumed that the Lafayette attendant did ask how many persons were aboard and that Mr. Somlo gave him a false answer, and that the District Court then unjustly drew adverse inferences concerning Mr. Somlo's moral character. However, on Mr. Somlo's own account, it would be reasonable to infer that he forestalled a direct question by volunteering what was misleading information as the attendant did then fill out the form with the figure "1". Mr. Ridgeway testified that in taking a flight plan he would ask for the number of persons on board for search and rescue purposes without concern as to whether they were passengers or crew. The Trial Judge stated clearly that his evaluation of credibility was based not only on what the Court felt was a misrepresentation but on demeanor and all other factors which might influence a trier of fact in judging credibility.

As indicated, Mr. Somlo continued his flight toward Chicago after Bowling Green although his aircraft did not tolerate ice well and did not have de-icing equipment. In response to a comment at oral argument, counsel for plaintiffs made inquiries and later wrote the Court that only 7 to 8% of the Cessna 310 aircraft are factory equipped with wing and stabilizer de-icing equipment. At trial, Mr. Somlo testified that such equipment was optional but that the majority of pilots of smaller craft such as this one would avoid icing conditions.

In order to fly under instrument conditions, a pilot must file an instrument flight plan with Air Traffic Control. The pilot may radio his plan to a Flight Service Station attendant who transcribes it on a form and relays it to an Air Traffic Control Center for approval. Mr. Somlo radioed his plan to the Lafay-

ette attendant, Billy R. Caton. As stated, the form on which the flight plan was recorded was an exhibit at the trial. It shows destination to be O'Hare via airway Victor 171 to Peotone, then to Midway via Victor 53 "or Per ATC" which meant that Air Traffic Control could direct Mr. Somlo via his requested route or another route chosen by Air Traffic Control.

Mr. Somlo disputed the accuracy of the form. He testified that he also asked for an alternate airport at Rockford and that he never asked for "or Per ATC" to be included in the plan. The District Judge, however, did not credit Mr. Somlo's testimony on this point.

When Mr. Caton radioed the plan to Chicago Air Traffic Control Center for approval, he did not include the Victor 53 routing, but said "and any routing you can give him after Peotone landing O'Hare." The District Court held this not to constitute a substantial alteration because "or Per ATC" allowed Air Traffic Control to change the plan. We agree.

As advised, Mr. Somlo checked with the Control Center after passing Danville and was told he was cleared to Peotone, Illinois, at 3000 feet and then directed to the Lowell, Indiana, intersection. At 4:34 P.M. the Control Center gave Mr. Somlo clearance to climb to 6000 feet. By agreement between Chicago Control Center and O'Hare Approach Control, inbound flights are maintained at 6000 feet so that outward bound flights may fly under them. Departures from this procedure are allowed only on approval from O'Hare. When at 4500 feet, Mr. Somlo found he was icing badly he reported that to Chicago Control Center which allowed him to return to 3000 feet and began procedures to secure approval from O'Hare to maintain him at that low altitude.

Mr. Somlo was unable to see his wing icing observation light because of the ice even after he returned to 3000 feet. At 4:37 P.M. the Chicago Center cleared him to the Chicago Heights VOR (a station transmitting radio waves in all directions for use of pilots in navigation) maintaining 3000 feet, where he was advised to take up a holding pattern south of the Chicago Heights VOR at 3000 feet, and expect clearance for O'Hare in about 52 minutes at 5:34 P.M.

Robert A. Riddle, Air Traffic Specialist with the Chicago Control Center, testified that he couldn't bring Mr. Somlo beyond Chicago Heights at 3000 feet because O'Hare aircraft were departing at that altitude.

Another conflict in the testimony occurs with reference to this aspect of the case. Mr. Somlo testified that he told the Center he could not accept that approach clearance because of icing conditions and lack of safety gas, adding the words "Tiny Tim" which he said meant a minor emergency. None of the other witnesses, experienced in air traffic communications, recognized this expression. The statement does not appear on the transcripts of the tape recordings made of communications at the Control Center which indicate that Mr. Somlo said "Ah say again time that'll be over an hour" and then repeated the instructions which were given to him again. Mr. Riddle testified that Mr. Somlo said nothing about icing at 3000 feet and that about nine other aircraft in his sector were waiting to get into O'Hare.

Meanwhile, as indicated, clearance for 3000 feet was being requested from O'Hare Approach Control. When Mr. Somlo was advised to make contact with O'Hare Approach Control, his windshield was already covered with ice, but the transcriptions of the tapes show no such information given to the Chicago Control Center, which had also been left ignorant of the absence of de-icing equipment on the aircraft. Mr. Somlo testified that he thought O'Hare knew of his condition and was confirmed in this view because the first instructions he received from O'Hare led him to believe he was being given emergency treatment. There is nothing on the tran-

scriptions of the tapes to justify Mr. Somlo's belief. We are satisfied, as was the District Judge, that the transcriptions, which dovetail, are complete.

Bernard R. Curtis of the Federal Aviation Administration in Washington, D. C. testified that Mr. Somlo was given preferential treatment because he would not accept clearance at 6000 feet because of icing at that altitude, and it was necessary to bring him out of the 3000 feet altitude which was needed for departing aircraft. He was asked if he could proceed from Chicago Heights to Beacon intersection (above Meigs Field in Chicago) via airway Victor 7 (a north-south direction along the lake front) at 3000 feet. Both Meigs and Midway Airports were closer to Chicago Heights than O'Hare, but Mr. Somlo made no request to land at either.

James Rowan, an employee of the Federal Aviation Agency at O'Hare Control Tower, testified that precision approaches were at that time possible at Midway, that in such approaches the pilot needs no altitude charts, he is steered to a runway; altitude information and headings are given to him. He stated that this method of landing is initiated by pilot request. Mr. Somlo made no such request.

At 4:47 P.M. CST O'Hare Approach Control assigned Mr. Somlo an instrument approach to Runway 14 Right at O'Hare. Following instructions given, Mr. Somlo crossed airway Victor 6 and was observed on the O'Hare Approach Control radar. Although the aircraft was buffeting and accumulating more ice as it ran into sloughs of moisture, in response to a query whether he had turned from the assigned heading, he reported merely that he iced up a "little bit" and had a "little problem" straightening out.

At 5:00 P.M. O'Hare Approach asked for his heading and Mr. Somlo gave it as 350 degrees. A few minutes later O'Hare Approach again asked for the heading and received a garbled response. Requests for repetition were made without result. No further messages were received from the aircraft. Transcript of the tape shows the last garbled statement as "icing up terribly can you help me sir." Shortly afterward the aircraft crashed about eight miles east of O'Hare.

Mr. Somlo testified that his visibility improved, as he came down out of the overcast closer to the ground, that his windshield defrosters were working as on an automobile, that he tried to make an emergency landing in a field but one wing hit a light post and deflected the aircraft into a building.

The District Judge determined that failure to give Advisory Delta at Lafayette again after it had been given at Bowling Green was not a proximate cause of the accident; that it became Mr. Somlo's duty having been warned of the possibility of icing to inquire whether icing was still a factor. He found the proximate cause of the crash was Mr. Somlo's own negligence in bringing his aircraft into an area of known probable icing conditions in the midst of a notorious Chicago winter, and in failing to get his plane out of the air as soon as possible after first experiencing ice problems. He found Mr. Somlo's negligence of such magnitude as to bar the claims of all the plaintiffs. We agree.

Plaintiffs argue that the credibility findings are not dispositive of this case. It is plaintiff's theory that even if given the Advisory Delta at Bowling Green warning of possibilities of local icing over a three-state region, Mr. Somlo was also given forecasts for Chicago which predicted clear weather conditions at the time of his projected arrival, and that his request for weather information at Lafayette was adequate, that without special inquiry he should have been informed whether Advisory Delta was still in effect and given a full briefing instead of a response to his specific inquiries which would confirm the favorable aspect of the Bowling Green data.

Advisory Delta was issued at 1:25 P. M. CST. The forecast for O'Hare given

at Bowling Green was issued at 12:40 P.M. CST prior to Advisory Delta. At Lafayette Mr. Somlo was given the current O'Hare weather, as he requested, which showed that at 3:00 P.M. CST instrument conditions prevailed which ought not to have reassured him despite failure to receive an amended forecast predicting for O'Hare the icing conditions already predicted by Advisory Delta for the general region including O'Hare. He was told of a dew point of 27 and temperature of 31. Jacob W. Morgan, an Aviation Forecaster employed by the U. S. Weather Bureau, testified that a spread of four degrees between dew point and temperature indicates possibility of fog and that one should expect moisture. Mr. Somlo knew there was a possibility of instrument conditions when he filed his flight plan.

Plaintiffs also assert that the evidence shows Mr. Somlo did advise Chicago Control accurately in that he reported icing at the higher altitudes. But he gave no warning of difficulties at lower altitudes. It seems to be the view of the plaintiffs that Mr. Somlo did not continue to have icing difficulties at 3000 feet. However, he did testify that even at 3000 feet he was unable to see his wing icing observation light and did not again see it at any time. Even when conditions grew extremely serious, Mr. Somlo minimized his difficulties in reporting to O'Hare Approach and at no time reported his lack of de-icing equipment.

█ We agree with Plaintiffs' general assertion that government regulations which provide that the pilot has the primary responsibility for the movement of his aircraft do not impose responsibility on him for an accident unless he knows or is held to have known all the facts which were then material to the safe operation of his aircraft. Plaintiffs rely on Furumizo v. United States, 1965, 245 F.Supp. 981, affd. 9 Cir., 1967, 381 F.2d 965. In *Furumizo*, a student flyer in a dual-control training plane, accompanied by an inadequately informed instructor, was negligently given clearance to take off in the wake of a large commercial jet plane. The District Court there found that the government's negligence was a proximate cause of the crash of the small plane. The District Court noted that a well-trained pilot schooled (as the instructor evidently was not) in the dangers to planes of the size of the training craft from turbulence created by planes the size of the jet, would have waited, as other pilots did, for a reasonable time to allow the most violent aspects of the turbulence to abate. The District Judge held that the controllers' seeing the small plane take off, when the pilot should have waited, and failing to exercise any judgment whatever, constituted negligence, and was a contributing cause along with the negligence of the flying school in failing to furnish an adequately trained pilot instructor. The District Judge found the government and the school equally liable and ruled that each pay one-half of the judgment.

The Ninth Circuit stressed the fact that this was not an instance of controllers following the regulations and then having their attention called elsewhere. The controllers actually saw the small plane start its takeoff in the face of what they knew to be extreme danger. The Ninth Circuit declined to hold the District Court's findings to be clearly erroneous.

In the case before us it was Mr. Somlo who knew the facts material to the safety of his aircraft. He was better informed concerning the state of that aircraft than the government employees from whom he withheld vital facts until it was too late.

The sole negligence imputed to the government in this record is a failure to repeat information already given. We agree with the District Court's finding that this omission was not a proximate cause of the crash. No misleading information was ever given as in some of the cases cited by the Plaintiffs.

For example Plaintiffs see a need to reverse because the District Judge cited

Hartz v. United States, N.D., Ga., 1965, 249 F.Supp. 119, since reversed 5 Cir., 1968, 387 F.2d 870. *Hartz* also concerned a small plane takeoff into turbulence. The Fifth Circuit recognized that the pilot retains primary responsibility for the movement of his aircraft (p. 873, citing cases).

In *Hartz* a light plane encountered turbulence of a trailing vortex shed by the right wing of a departing DC–7. The sole warning given the small plane by the controller was "* * * cleared for take-off, watch the prop wash." The District Judge held that the controller's duty required no more than maintenance of separation between aircraft to avoid a collision. He also thought that the warning given was adequate because information concerning various types of turbulences created by large multi-engine planes had been tabulated in publications available to the pilot. The Fifth Circuit differed, holding that the controller, who was stationed high above the lighted airfield where he had a commanding view of the DC–7 and all other aircraft in the vicinity and who knew the hazards facing the small plane, was in far better position to exercise judgment than the pilot down on the runway awaiting takeoff directions. The Court of Appeals held that it was the controller's duty to warn and that the warning he gave was not sufficient. The Air Traffic Procedures Manual provided the phraseology to be used for such warnings regarding possible rotocraft downwash, thrust stream turbulence, and/or wing tip vortices, as "Caution, Turbulence" followed by traffic information. The example given is "Departing American Electra." (387 F.2d 873 ftn 4) As Plaintiffs note, the Court of Appeals states that the duty of an FAA controller is not circumscribed within the narrow limits of an operations manual, but the Court also found that the controller did not follow the manual in this case. "Prop wash" and wing tip vortex are not identical. The latter lasts longer and is more hazardous. In effect the pi-

lot was misled. This situation is different from the facts before us.

In Neff v. United States, D.C., D.C., 1968, 282 F.Supp. 910, on which plaintiffs also rely, a thunderstorm which enveloped the aircraft immediately at take-off caused it to crash. The District Court, emphasizing the fact that each airline accident must be considered in the light of its own particular circumstances, found that the tower personnel were in a far better position than the plane crew on the ground to see the approach of the storm. The Court held that if they failed to see it, they were negligent; if they saw it and failed to notify the plane in the circumstances existing in this case, they were also negligent. In the case before us here, on the basis of what they knew and should have known, the FAA controllers fully performed their duty to the plaintiffs.

■ We find no error in excluding the report of the Civil Aeronautics Board investigator under authority of Title 49 U.S.C. § 1441(e) which provides that the Board's reports relating to an accident or investigation of it shall not be admitted as evidence in any suit for damages growing out of the matter mentioned in such reports. Plaintiffs argue that the ultimate cause of the accident, a buildup of ice on the wings, not being a matter of speculation, no harm could result from admission of a summary of weather data as an exception to the general rule. However, as the government points out, a summary of "pertinent" meteorological factors does represent hearsay opinion evidence, and most of the records mentioned in the report were themselves introduced into evidence.

We have carefully considered all the other points and authorities cited by the plaintiffs and have weighed all the arguments advanced, but are left with the conclusion that there is no error in the District Court proceedings. The judgment of the District Court is affirmed.

Affirmed.