Gordon **TILLEY**, Plaintiff,

v.

**DELTA AIR LINES, INC., and United States of America, Defendants.**

Civ. A. No. AC-1489.

United States District Court
D. South Carolina,
Columbia Division.

Feb. 1, 1966.

---

Charles D. Davis, and Harold Seigler, Columbia, S. C., for plaintiff.

Edward W. Mullins, Sr., Edward W. Mullins, Jr., and Claude M. Scarborough, Jr., Columbia, S. C., for defendant Delta Air Lines, Inc.

Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., Michael R. Wherry, and Thomas W. Reilly, Dept. of Justice, Washington, D. C., for defendant United States.

HEMPHILL, District Judge.

Action for recovery of damages for personal injuries sustained by the plaintiff, as a consequence of an airplane accident at John F. Kennedy International Airport (formerly Idlewild Airport), New York, and while a passenger on a plane of defendant, Delta Air Lines, Inc.

Suit is brought against defendant, United States of America (sometimes herein referred to as Government) under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), and 2402, and against defendant, Delta Air Lines, Inc., based upon diversity of citizenship and the amount in controversy. The action was tried before the Court and a jury beginning November 1, 1965. In accordance with the provisions of the Federal

Tort Claims Act, all issues as to the United States were tried by the Court. The issues between plaintiff and Delta Airlines, Inc., were tried by jury which returned a verdict for that defendant on November 4, 1965.

On August 25, 1962, plaintiff, Gordon Tilley, boarded at John F. Kennedy International Airport (then Idlewild Airport), New York, New York, and became a fare paying passenger aboard Delta Airlines Flight 821, (sometimes hereinafter referred to as Delta) which was a scheduled flight from New York City to Atlanta, Georgia. Delta Air Lines Flight 821 was a DC–8 four engine jet aircraft manufactured by the Douglas Aircraft Company.

Plaintiff, holding a first class ticket, was seated in a window seat on the right hand side of the aircraft, approximately over the right wing. Delta 821 was piloted by Captain Reed Knight, an employee of Delta Air Lines, who at all pertinent times was acting within the scope of his employment.

Idlewild Airport was equipped with an air traffic control tower, operated by the Federal Aviation Agency, an agency of the United States. At all pertinent times Charles Endy was occupying the local control position in the tower and Thomas Forster was acting as tower cab co-ordinator, both of whom were employees of the United States acting within the scope of their employment.

Shortly before 4:30 P.M., local time Delta 821 departed the ramp area and taxied via taxiway Queen to the run-up area for Runway 13 Right (13R), the active runway then being used for takeoffs and landings. Runway 13R is 14,572 feet in length and has a total width of 200 feet, 150 feet of concrete surface bordered on each side by 25 feet of asphalt. Runway 13R runs in a generally southeasterly direction, having a magnetic heading of 130 degrees. The run-up area for Runway 13R is located immediately to the left of the threshold of that runway and while in the run-up area Delta 821 was positioned approximately 90 degrees to the runway heading.

Subsequent to conducting his preflight check in the run-up area, the pilot of Delta 821 was issued a clearance by the local controller to proceed into takeoff position on the runway; however, prior to entering onto the runway the Delta pilot observed a Sabena jet aircraft (hereinafter referred to as Sabena) to his left in the process of landing on Runway 13R; he also observed to his right a Boeing 707 jet aircraft (hereinafter referred to as Air France) in the landing pattern from Runway 13R.

At all pertinent times, Sabena, Delta and Air France aircrafts were under the "control" [1] of employees of Federal Aviation Agency at air traffic control tower, Idlewild Airport, N. Y.

Mr. Endy, local controller directed Delta onto Runway 13R and the pilot of Delta proceeded into take-off position approximately 100 feet down the runway. In this position, the pilot of Delta could no longer see Air France continuing its approach for landing on 13R. The Sabena aircraft continued to taxi down the runway 13R and did not exit from the runway at either of the first three available taxiway turnoffs. The spacing between Delta and Air France was then rapidly closing. The local controller, in an excited voice and with a tone of emergency directed Delta to immediately clear the runway to the left. The pilot of Delta, not knowing the proximity of Air France, endeavored to maneuver his plane to the left in order to comply with instructions of the controller, applied power to his engines and in the process the nose wheel ran off the runway a distance of 10 to 15 feet, became imbedded in the dirt, and came to a sudden and jolting stop.

The local controller ordered Delta to clear Runway 13R for Air France to land

---

1. "Control" here means that the F.A.A. exercised such supervision over the aircraft and its pilots that any order or "direction" given had to be obeyed absolutely, unless the order was hazardous to undertake or plainly contrary to the rules of flight.

when Air France could not land on runway 13R with Sabena still on that runway without violating air traffic control procedure regulations. Following the foregoing instructions to Delta, the local controller instructed the pilot of Air France to go around and not to land on runway 13R. Shortly after Delta's nose-wheel became imbedded in the dirt, Air France flew over Delta at a low altitude but did not then land on runway 13R.

The Government argues that a 180 degree left turn could have been made by Delta without the nose-wheel running off the runway and that the application of too much power by the pilot caused the nose-wheel to leave the runway and caused it to become stuck in the sand. The failure of the local controller to give Delta any information relative to Air France aircraft and the urgent and excited manner in which instructions were given to Delta to immediately clear the runway to the left caused the pilot of Delta to conclude that there was great urgency in clearing the runway immediately.

The local controller testified that he gave the instructions to Delta to clear the runway in order to prevent a dangerous situation. Proper spacing between the planes under the control of the local controller was not maintained. Air France was allowed to continue in the landing pattern without furnishing the pilot of Delta any information with regard to its position relative to Delta.

The sudden jolting stop of the aircraft threw plaintiff forward in his seat, causing him to suffer injuries to his back. Plaintiff, who had his seat belt fastened, immediately experienced pain in his back. He took the next available plane out of New York to Atlanta, Georgia, and arrived in Columbia, South Carolina, the next day. He continued to experience pain in his back and upon arriving in Columbia, he called his doctor, Dr. Emmett M. Lunceford, Jr.

Plaintiff had formerly had operations performed on his back, one in 1953, undergoing a disc and fusion operation. In May, 1961, a disc was removed from plaintiff's back and on July 5th, 1961, further spinal fusion was carried out. Plaintiff's recuperation appeared to be complete prior to the injuries of which he now complains. X-rays were taken of plaintiff's back in January, 1962, and evidenced good union at the operation site. He was last seen by his doctor in March, 1962, at which time he appeared to be doing well, having earlier returned to work and experiencing only intermittent pain and discomfort.

Immediately after plaintiff's first consultation with his doctor and after arriving in Columbia, he took prescribed medicines for pain, muscle relaxants and analgesics and commenced to wear a back brace which he previously wore following an earlier operation. Plaintiff continued under the treatment of his doctor and on November 13, 1962, he was hospitalized until November 18, 1962. At that time, x-rays demonstated motion between L–4 and L–5 vertebrae. Conservative treatment was exhausted by March 3, 1963, when he was hospitalized from that date until May 17, 1963, and had performed upon him an anterior interbody fusion of his spine performed between L–4, L–5 and S–1. He thereafter was readmitted to the hospital on June 26, 1963, for a period of five days; on January 26, 1964, for a period of six days; on November 5, 1964, for a period of twelve days; and on November 20, 1964, for a period of nine days. During this period of time plaintiff suffered considerable pain and was required to wear a back brace during a large part of the time.

Plaintiff is now and was on the 25th of August, 1962, employed as a medical technician with Veterans Administration, Columbia, S. C. He had an average weekly pay of $90.00 with a take home average pay of $49.50 weekly. Plaintiff lost a total of thirty weeks from his employment. He received compensation for all of this loss of time through sick pay, annual leave or otherwise, except nine weeks and two days.

Medical testimony indicated an increased permanent disability of five to

fifteen per cent over the pre-existing permanent disability of plaintiff. It is clear that plaintiff has an increase of ten per cent permanent disability caused by the injuries sustained by him on August 25, 1962. At the time of injury, plaintiff was forty-two years of age and had a life expectancy of 30.41 years.

In connection with plaintiff's injuries, he has paid or obligated himself to pay the following: The Moore Clinic, Columbia, S. C., $1,133.65; Columbia Hospital, Columbia, S. C., $2,753.22; nurses, $215.00; and Columbia Brace Shop, Columbia, S. C., for repairs to brace, $25.00, amounting to a total of $4,126.87.

The accident in question occurred on August 25, 1962. At that time there were in effect Civil Air Regulations adopted by the Federal Aviation Agency, including Air Traffic Rules. These are set forth in Exhibit P–11. Section 60.19 thereof provides:

Air Traffic Control Instructions. No person shall operate an aircraft contrary to Air Traffic Control Instructions in areas where Air Traffic Control is exercised.

Part 400 of Air Traffic Control Procedures promulgated for and in use by Federal Aviation Agency controllers and in effect on date of accident is set forth in Exhibit P–12. Section 400.1 thereof provides:

Airport Traffic Control towers shall provide Airport Traffic Control Service, and in so doing shall issue and relay such clearances and information as will facilitate use of airports by aircraft.

Section 419–1 provides:

Taxi information shall include the route by which the aircraft may proceed on the movement area, plus instructions to hold at a specific point and other information as necessary.

Section 419.3 provides:

Because of possible restrictions to the pilot's field of vision while taxiing aircraft, Airport Traffic Controllers should be alert to provide information which, in their judgment, will assist the pilots in taxiing.

Section 420.1 provides:

Separation of aircraft landing and taking off shall be governed by the procedures and minima set forth below.

Section 421.1 provides:

Separation shall be effected by establishing the sequence of arriving and departing aircraft and advising pilots thereof to make such adjustments in flight or ground operation as are necessary to accomplish the desired spacing between aircraft in accordance with the minima in 422, 423 or 424. * * *

Section 422.5 provides:

Between a departing aircraft waiting take-off clearance and arriving aircraft, sufficient separation, established by holding the departing aircraft short of the runway, so that: *The arriving aircraft will not pass over or in close proximity to the departing aircraft.* [Emphasis supplied.]

After instructing Delta to leave the run-up area for runway 13R and to taxi on to the runway 13R to take-off position and hold, the local controller failed to give the pilot of Delta any information as to Air France, its activities, position in relation to Delta or its proximity to Delta in violation of section 419.1 and 419.3 of Air Traffic Control Procedures.

The local controller knew that Sabina had not taxied off runway 13R, that Air France was in the landing pattern for landing on 13R, yet the local controller instructed Delta to taxi onto runway 13R to take off position and hold, permitting Air France to continue its landing approach, so that when Air France was finally instructed to go around and not land on runway 13R, it passed over and in close proximity to Delta in violation of section 422.5 of Air Traffic Control Procedure.

■ Defendant, United States of America, was guilty of negligence in that its employee, the local controller, failed to provide and maintain proper spacing be-

tween Delta, a departing aircraft, and Air France, a landing aircraft, failed to anticipate activities of Sabena aircraft, still taxiing on runway after landing and Air France making final approach for landing when ordering Delta to take-off position on the same runway, failed to inform pilot of Delta of proximity of Air France in final landing approach, created an emergency situation, violated Air Traffic Control Procedure regulations, failed to timely issue appropriate instructions to pilots of Delta and Air France, issued instructions to Delta pilot to clear runway in an exciting voice and urgent manner and in ordering Delta off the runway for Air France to land when Sabena was still on runway, preventing the landing of Air France without violation of Air Traffic Control Procedure regulations. The negligence of defendant, United States of America, was the direct and proximate cause of injuries suffered by plaintiff.

 The pilot of Delta was following emergency instructions from the local controller and even if he had applied too much power in undertaking to comply with the controller's instructions, it was not such an intervening act as would relieve the Government of liability for its negligent acts, which were the proximate cause of plaintiff's injuries. See Medlin v. United States, 244 F.Supp. 403, 409, 410 (W.D.S.C.1965).

The local controller, though in a sense exercising discretion as to what he should do, or refrain from doing, was not performing the sort of discretionary function contemplated by 28 U.S.C. § 2680(a). His acts or omissions which proximately resulted in plaintiff's injury were only operational details, and the discretion exercised in the performance of these details was not such as to be considered "discretion" within the meaning of the Act. See White v. United States, 317 F.2d 13, 17 (4th Cir. 1963); Epps v. United States, 187 F.Supp. 584, 589 (E.D. S.C.1960); Hardy v. United States, 187 F.Supp. 756, 762 (E.D.S.C.1960); and note the excellent annotation in 99 A.L.R.2d 1016, 1045, § 20 (1965).

Plaintiff was not guilty of any negligence which in any way contributed to the injuries he sustained. True, his back had a pre-existing infirmity, but a pre-existing infirmity does not grant a negligent defendant absolution because of the greater susceptibility to injury. See Vaughan v. Southern Bakeries Co., 247 F.Supp. 782, n. 3. (D.S.C.1965). The Government's defense of assumption of risk falls far short of being convincing.

Taking full account of plaintiff's injuries, the Court finds plaintiff is entitled to have judgment against the Government in the amount of $17,500.00.

Accordingly, Judgment will be entered in favor of plaintiff in the amount of $17,500.00.

And it is so ordered.