**Gordon TILLEY, Appellee,**

**v.**

**UNITED STATES of America, Appellant.**

**No. 10732.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 11, 1967.

Decided April 3, 1967.

Kathryn H. Baldwin, Atty., Dept. of Justice, (John W. Douglas, Asst. Atty. Gen., Morton Hollander and Edward Berlin, Attys., Dept. of Justice, and Terrell L. Glenn, U. S. Atty., on brief), for appellant.

Henry Hammer and Harold C. Seigler, Columbia, S. C. (Charles D. Davis, Columbia, S. C., on brief), for appellee.

Before BOREMAN and WINTER, Circuit Judges, and KAUFMAN, District Judge.

BOREMAN, Circuit Judge:

Gordon Tilley sued the United States under the Federal Tort Claims Act and Delta Airlines for damages for injuries suffered when a Delta jet plane in which he was a passenger skidded off the paved portion of a runway into soft ground. The action against Delta, tried before a jury, resulted in a verdict in favor of Delta Airlines. In the action against the United States, tried on the same evidence and at the same time before the court pursuant to 28 U.S.C. § 1346(b) and § 2402, the court held the United States liable to plaintiff for negligence of the tower controller, a Federal Aviation Agency (FAA) employee, in failing to follow applicable regulations, in failing to anticipate and prevent an emergency situation and in issuing orders to the Delta pilot. Upon a finding that a pre-existing back injury had been aggravated Tilley was awarded $17,500. The Government appeals and contends that since the primary duty for operating an aircraft rests in the pilot the District Court erred in holding the United States liable for plaintiff's injuries. We feel compelled to reverse the judgment below.

The evidence at trial disclosed that on August 25, 1962, Tilley was a passenger aboard a Delta DC–8 which was preparing to take off from Kennedy International Airport (then Idlewild) in New York bound for Atlanta, Georgia. The weather was clear, the runways were dry and visibility was from ten to twelve miles. Consequently, Visual Flight Rules (VFR) were in use. The plane proceeded to taxi onto the strip adjacent to runway 13–R preparatory to using 13–R for takeoff. At this point the Delta pilot, Captain Knight, could see a Sabena jet preparing to land on runway 13–R, and an Air France jet which was some five miles away but also in the landing pattern for

the same runway. Immediately after the Sabena had touched down but prior to its exiting from 13–R runway the Delta was authorized by the tower controller, Charles Endy, to taxi onto this runway and hold its position there.[1] The Delta pilot followed this instruction and maneuvered the plane to the center of the runway. In this position Captain Knight no longer was able to observe the pattern and activities of Air France but he had his radio tuned to the same frequency being used by Air France, Sabena and the tower controller, in the manner of a four-way telephone conversation. The Sabena, which normally would have used one of the first three exits from the runway, passed these early exits and continued down the runway. It was then the controller realized that there would not be sufficient time to permit Delta to take off and Air France to land on the same runway as contemplated. The controller had to quickly decide whether (1) to have the Delta aircraft make a left turn of 180° from the runway back onto the taxiway and permit Air France to land; or, (2) to request Air France to continue in flight and circle the airport until after Delta had departed. This latter alternative would have required Air France to travel an additional eighty miles while the first choice would have delayed Delta a mere fifteen or twenty seconds. Accordingly the controller instructed Delta to clear the runway and return to the taxiway. The evidence established that in order to execute this maneuver and make the 180° left turn from the center of the runway 76 feet 11 inches of runway are required. The width of 13–R runway is 200 feet, 150 feet of concrete and 25 feet of asphalt on either side. With its nosewheel on the center line of the runway the Delta had 23 feet 1 inch more of the paved portion than required for making the turn. The pilot in executing this maneuver applied an excess

of power which caused the nosewheel to skip. As a consequence of this skipping and the pilot's attempt to straighten the nosewheel the aircraft went off the paved portion of the runway into the soft dirt and skidded to a stop. Tilley, who had his safety belt fastened, testified that he was jolted forward and was injured. Captain Knight, Delta's pilot, testified that he detected a tone of excitement and urgency in the controller's voice but had no doubt the maneuver could be executed with safety. There were no other injuries and three passengers testified that the plane seemed to come to a normal stop. The aircraft was in no way disabled and was permitted to take off later that day.

The District Court found that the United States was negligent in that its employee, the controller: improperly spaced the aircraft at the landing strip; failed to anticipate the activities of the Sabena; failed to inform the Delta pilot of the proximity of Air France; created an emergency; violated "Air Traffic Control Regulations"; failed to issue timely instructions to Air France and Delta pilots; and, finally, issued the instructions to the Delta pilot to leave the runway in an excited voice and urgent manner. 249 F.Supp. 696, 700 (D.S.C. 1966).

Certain air traffic procedure regulations promulgated by the Federal Aviation Agency were in effect at the time of this incident. Such regulations have the force of law. United States v. Schultetus, 277 F.2d 322, 327, 86 A.L.R.2d 375 (5 Cir.), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960). Part 400 of the Air Traffic Control Procedures describes the duties of the controller generally to provide traffic service, clearances and other information to assist pilots.[2] Section 419 provides, *inter alia*, that the controller should inform pilots of taxiing aircraft as to positions to be taken and

---

1. The practice of permitting a departing aircraft to take a position on a runway not yet vacated by an incoming plane is common at major airfields and is referred to as "one on, one off."

2. 400.1 provides: "Airport traffic control towers shall provide airport traffic control service, and in so doing shall issue and relay such clearances and information as will facilitate use of airports by aircraft."

furnish other information to assist pilots in taxiing.[3]

Section 60.2 of the Civil Air Regulations, Air Traffic Rules, describes the duties of a pilot in command of the aircraft and vests him with final authority as to operation of the aircraft.[4]

Delta pilot, Captain Knight, upon cross-examination admitted that under Civil Air Regulations while a pilot is subject to the instructions of the local tower controller, such instructions may be disregarded if the pilot feels that execution thereof would jeopardize the safety of the aircraft and its passengers. He stated that in his opinion it was perfectly safe and proper for the controller to have instructed him to turn onto the runway while the Sabena was still there. Furthermore, he testified that it was proper, even if an emergency existed, for the controller to have instructed him to remove the plane from the 13–R runway. He stated that he had no doubt as to his ability to accomplish this maneuver safely and that if he had such doubt he could have radioed the tower and refused to follow the instruction.[5] However, he stated

further that he thought the instruction was given in an urgent voice tone and that because of such tone he believed an urgent situation existed.[6] Charles Endy, the controller who issued the order, repeated the order in court as part of his testimony. The content of the instruction was "Delta 821, taxi back to the run-up block." Mr. Endy testified that there was nothing which would indicate that there was any immediacy or urgency in the situation.

Edmund Burke, an FAA employee who had a great deal of experience as tower controller at major airfields, testified that the instruction given and the choice made by Endy in this situation followed usual and common practice. He further stated that he had experienced situations in which the departing aircraft was unable to be cleared for take-off from a runway while an arriving aircraft was approaching and that the "simplest solution" in such a situation was to request the departing aircraft to taxi off the runway. This procedure, he stated, is more desirable than asking the arriving aircraft to circle because it prevents traffic congestion in approaches.

3. 419.1 "Taxi information shall include the route by which the aircraft may proceed on the movement area, plus instructions to hold at a specific point and other information, as necessary."
419.3 "Because of possible restrictions to the pilots' field of vision while taxiing aircraft, airport traffic controllers should be alert to provide information which, in their judgment, will assist pilots in taxiing."

4. 60.2 Civil Air Regulations: "The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft. In emergency situations which require immediate decision and action the pilot may deviate from the rules prescribed in this part to the extent required by consideration of safety."

5. [Mr. Wherry] "Q. Before you undertook to turn, did you attempt to insure the operation could be conducted safely?
[Captain Knight] "A. I think so.
"Q. Was there any doubt in your mind at the time you commenced the turn that you could complete it?
"A. None at all, no.

"Q. And had there been what would you have done?
"A. I would have probably called the tower back and told them we couldn't move.
"Q. And you could have done that?
"A. Certainly, but I was—
"Q. And you could have called the tower and said, send him around (Air France) I don't think I can make the turn.
"A. I was instructed to turn and I thought I could turn * * * and that's what I was attempting to do.
"Q. What I am asking you is if you felt there was an emergency situation present could you not have called the tower and said, I don't think I can get off that quickly, send him around.
"A. That could be true."

6. Captain Knight went to the control tower to listen to the tape recording of this instruction but because the tower was so busy it was not supplied to him. The tape was not produced at trial because it had been destroyed pursuant to an FAA regulation before Tilley complained of his injury.

The Government's major contentions may be stated as follows: Under FAA rules and the decisions of the courts, the pilot, not the tower controller, is primarily responsible for the safe operation of the aircraft; the large numbers of aviation accidents have given rise to a substantial amount of litigation from which has evolved a body of law establishing the respective duties of the tower controller and the pilot under VFR conditions; it is well settled that under VFR the primary duty for the safe operation of the aircraft rests with its pilot, Civil Air Regulation 60.2, (n. 4), United States v. Miller, 303 F.2d 703, 710 (9 Cir. 1962), cert. denied, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963), United States v. Schultetus, supra, 277 F.2d at 326–27, Hartz v. United States, 249 F.Supp. 119, 125 (N.D.Ga.1965), Wenninger v. United States, 234 F.Supp. 499, 517 (D.Del. 1964); in cases where the tower controller's breach of duty was far more flagrant than any alleged or proved here the courts have steadfastly held that the pilot was primarily responsible.

In United States v. Miller, 303 F.2d 703, supra, the Ninth Circuit reversed a decision of the District Court which held that the United States was negligent because the tower controllers, Government employees, had cleared, for landing, a Beechcraft in which plaintiffs were riding, at a time when the controllers knew that a Cessna was practicing landings. After the clearance the Beechcraft came over a hill and began its descent from an altitude of eleven hundred feet. The Cessna, executing a take-off, had made a 90° turn and was leveling off when the planes collided. The Beechcraft was visible from the control tower for eighteen to twenty-four seconds prior to impact and the trial court found that had the tower controllers been looking they would have recognized the hazardous situation developing. But neither controller was looking and no warning was issued. The Court of Appeals held that the Cessna had the right of way and that the Beechcraft was not excused from failure to yield the right of way by reason of the presence of tower controllers and the issuance of a clearance. The court said that the trial court probably concluded that the pilot was not contributorily negligent because tower controllers were present and that it was their primary duty to prevent collision. "Such a view would be erroneous, because the focal point of ultimate responsibility for the safe operation of aircraft under VFR weather conditions rests with the pilot. Under such conditions he is obligated to observe and avoid other traffic, even if he is flying with a traffic clearance." 303 F.2d at 710.

In United States v. Schultetus, supra, 277 F.2d 322, it was held that the controller's failure to signal an aircraft, to direct it to alter its course, and to properly space other aircraft did not relieve the pilot of primary responsibility for the safety of the aircraft and its passengers. There a Cessna 140 was practicing take-offs and landings and had just taken off. Two other Cessna 140's took off immediately after the first. A Cessna 170 was coming into the airport from the north in order to make a simulated instrument landing. The vision of the student pilot of the Cessna 170 was obscured so that he could practice with the instruments but the instructor's visibility was not impaired. The first Cessna 140 was flying in a northwesterly direction. The Cessna 170 was cleared to land and warned of the presence of a Cessna 140, but not of more than one. After a second warning the Cessna 170 replied that it had the other craft in sight. However, the Cessna 170 missed its approach and began to climb. A warning was issued that a Cessna 140 was in its path. This warning was acknowledged by the Cessna 170, but the pilot turned the craft and collided with the first Cessna 140. The trial court found that the tower controller was negligent in failing to warn that there was more than one Cessna 140, that he failed to warn the Cessna 140 of the danger, and that the planes were improperly spaced. The Fifth Circuit reversed, stating that "the district court has overlooked the principle that the direct and primary responsibility for the operation

of the aircraft over or in the vicinity of an airport rests upon the pilots of the aircraft." 277 F.2d at 328.

A recent district court decision, Hartz v. United States, 249 F.Supp. 119 (N.D. Ga.1965), dealt specifically with the question of the controller's improper spacing. In that case a Bonanza light aircraft was cleared into position to take off immediately after an Eastern DC–7 started down the runway for take-off. After Eastern passed the intersection where the Bonanza was "holding" the latter was cleared into position on the runway and requested to hold. After Eastern had passed down the runway the Bonanza was cleared for take-off. Bonanza took off but fell to the ground after attaining an altitude of only 95 feet. The court found that the cause of the crash was the vortex created by the wing suction of the Eastern plane. The court refused to find the United States negligent despite the fact that the tower controller had cleared Bonanza to take off at a time when Eastern's wing suction posed a hazard. The court emphasized the duty of the pilot who "after his clearance has been given for take-off, remains primarily responsible for the movement of his aircraft. In this case decedent Hartz was required to follow his clearance, not blindly, but correlative with his duty to exercise care for his own safety from everything of which he was aware." 249 F. Supp. at 125.

■ While these cases are factually distinguishable from the instant case we find them pertinently persuasive. In the case before us plaintiff's injury was caused by a jolt which occurred when the pilot failed to negotiate an admittedly simple and safe maneuver. Delta's pilot claims that he was led to believe from the tone of the controller's voice that an emergency existed which required him to vacate the runway. He did not state that the controller told him how many motors to use, how much power to apply, or how many degrees to turn his nose-wheel, or that the controller gave him any other directions relating to operation of the aircraft. Regulation 60.2 and the

cases vest the final duty for the safe operation of the aircraft under VFR conditions in the pilot. Even assuming *arguendo* the existence of an emergency the controller gave proper information and instructions to Delta, i. e., to vacate the runway. The pilot simply failed to execute the turn with requisite skill. The direction by the controller contained no words which, in themselves, indicated an emergency. It is clear, from the evidence, that the Delta pilot knew or should have known that Air France had not been cleared for landing and that, in fact, there was ample time for Delta to execute the turn.

The finding below, that the controller violated 419.1 and 419.3 (n. 3) of the Air Traffic Control Procedures by not providing the Delta pilot with information about other aircraft, ignored the fact that Delta had its radio tuned to the same frequency as Air France and the tower, and the Delta pilot could hear any instruction given to Air France. Also overlooked was the fact that the Delta pilot was given information and instruction, in compliance with these regulations, to vacate the runway. The purpose of the instruction was to permit Delta to assume a safe position during Air France's landing. Yet the court below found the controller negligent after he had given a perfectly proper and permissible instruction to Delta and thereafter the pilot executed such instruction in an unskillful manner. Indeed, to repeat, Captain Knight testified he was sure he could execute the maneuver safely and that, considering all the circumstances, the controller made the correct decision.

■ The further finding below was that the controller violated Section 422.5 of the Air Traffic Control Procedures. Section 422.5 provides in part that "arriving aircraft will not pass over or in close proximity to the departing aircraft." The court found "that when Air France was finally instructed to go around and not land on runway 13–R, it passed over and in close proximity to Delta in violation of section

422.5 of Air Traffic Control Procedure." 249 F.Supp. at 700. But this event occurred after Delta had left the runway and after plaintiff's injury. It could not have been the proximate cause of such injury. On the other hand, the safety of the entire operation seems self-evident from the fact that Air France had sufficient opportunity to circle the airport. Considering all the circumstances we cannot accept the finding and conclusion that plaintiff's injury was attributable to any negligence of the controller or to any breach of a duty owed by the Government to the plaintiff. It appears that the District Court not only would hold the controller responsible for supplying information to pilots but also would charge him with responsibility for the physical control, guidance and operation of the aircraft under normal visual flight conditions. Such a holding fails to take into consideration the· fact that the air traffic controller has a duty to all aircraft in, near and over the airport and cannot devote his undivided attention to a single aircraft. Franklin v. United States, 342 F.2d 581, 585 (7 Cir. 1965); New York Airways, Inc. v. United States, 283 F.2d 496, 498 (2 Cir. 1960).

■■ From what has been said above with reference to the absence of liability on the part of the Government, coupled with the undisputed fact of injury to Tilley, the reader might infer that we cast doubt on the correctness of the jury's verdict on the plaintiff's claim against Delta. For reasons not disclosed in this record, plaintiff did not appeal the jury's verdict exonerating Delta from liability. A determination of the correctness of that verdict would involve matters which are not before us such as review and consideration of evidentiary rulings made during the course of trial, the weight and sufficiency of the evidence and the charge of the District Judge. We have no power to review or reopen that aspect of the litigation or to require an appeal. Neither does the District Judge have such power. Conversely, plaintiff's failure to appeal the adverse determination of his case against Delta does not limit or foreclose consideration of his judgment against the United States as a separate and independent aspect of the over-all litigation. Confining ourselves to review and determination of the only issue before us on this appeal, we decide that the United States was not liable for plaintiff's injury. We reverse the decision below and direct the district court to enter final judgment for the United States.

Reversed.