**In re N–500L CASES.**

Civ. No. 78–2126.

United States District Court,
D. Puerto Rico.

April 28, 1981.
As Amended May 11 and Aug. 25, 1981.

Philip Silverman, Speiser, Krause & Madole, Washington, D. C., Harvey B. Nachman, Santurce, P. R., Paul E. Calvesbert, Hato Rey, P. R., attys. of the plaintiffs' committee.

Domingo A. Alvarez, Rio Pierdras, P. R., Richard H. Silver, Miami, Fla., Gabriel I. Penagaricano, Santurce, P. R., Jorge Ortiz Brunet, Ortiz, Toro, Ortiz, Bruner & Navelra, Hato Rey, P. R., James A. Toro, Old San Juan, P. R., Angel L. Tapia Flores, Rio Piedras, P. R., Rafael Ojeda Colón, San Juan, P. R., Gustavo Gelpi, Old San Juan, P. R., Jorge M. Suro, Santurce, P. R., Robert E. Schneider, Jr., Santurce, P. R., and Jiminez & Fuste, Hato Rey, P. R., for plaintiffs.

Francisco Ponsa Flores, San Juan, P. R., Alex Gonzalez, Dubon, Gonzalez & Vasquez, San Juan, P. R., Calvin F. David, Walton, Lantaff, Schroeder & Carson, Miami, Fla., Francisco, Agrait, Oliveras, Agrait & Oliveras, Hato Rey, P. R., Jose A. Masini Soler, Soler Favale & Masini Soler, Hato Rey, P. R., Phillip J. Kolczynski, U. S. Dept. of Justice, Washington, D. C., Vilma J. Vilá Sellés, Asst. U. S. Atty., Hato Rey, P. R., Steve Segal, Rio Piedras, P. R., Alberto J. Pérez Hernández Dubón, González & Vasquez, San Juan, P. R., Robert J. Griswold, San Juan, P. R., for defendants.

## DECISION AND ORDER

TORRUELLA, District Judge.

This is one of several decisions related to the September 26, 1978 crash of the N–500L,[1] a Twin Beech aircraft which came down in the Barrio Obrero section of San Juan, Puerto Rico. It is the first dealing with the merits of a tragedy which resulted in the death of all on board and caused diverse personal injuries and property damage on the ground. It is an undisputed fact that the cause of the accident was the wake turbulence ("wing tip vortex") generated by the overtaking and passing of N–500L by Eastern Air Line's Flight 75,[2] an L–1011 type aircraft, while both N–500L and EAL 75 were on final approach to land at Isla Verde International Airport and in direct communication with Federal Aviation Administration air traffic controllers of said facility.[3]

Twenty-nine suits were filed in this Court and thereafter consolidated. Defendants were EAL, FAA, Old South Air Service Inc. d/b/a Air Caribbean,[4] Francisco Cruz,[5] Cornhill Insurance Company, Ltd., representing certain underwriters at Lloyds of London,[6] and Corporación Insular de Seguros.[7] On the eve of trial of the lead case, EAL and the FAA admitted liability and settled all of Plaintiffs' claims for the total amount of $5,690,000.00, saving their alleged right of indemnity against N–500L, and against Cornhill and Corporación Insular, the insurers of the operator (Air Caribbean) and owner (Cruz) of the N–500L, respectively. All Defendants stipulated that the settlements arrived at were reasonable and that the Court need only determine the percentage of fault, if any, attributable to each Defendant. Thereafter a three-week trial ensued whereupon after hearing various witnesses, receiving numerous exhibits, and visually inspecting the Isla Verde Control Tower the Court made preliminary findings from the bench.

We consider the following to be the immediate and proximate causes of this accident: While both EAL 75 and N–500L were on parallel easterly courses, N–500L crossed EAL 75's path from right to left, thus putting itself in a position which reasonably could be foreseen to be downwind and below EAL 75's projected flight path, a location which placed N–500L in a dangerous position vis-a-vis EAL 75's wing tip vortex; thereafter, EAL 75 overtook N–500L in close proximity and from a higher altitude, a viewpoint which permitted its crew to observe the dangerous situation created by N–500L's maneuver; nevertheless, and although aware that N–500L had lost sight of it shortly before the point of overtaking, EAL 75 continued unswervingly on its path without attempting to minimize the impact of this encounter; meanwhile, the FAA controller when asked by N–500L for help in locating its "lost traffic" (i.e., EAL 75), failed in his duty to aid the N–500L not only by not using the various means at his disposal to locate the respective positions of the aircraft, but also by giving N–500L a response which lured the pilot of N–500L into a false sense of security and further led him into the wake of the EAL 75; lastly, the pilot of the N–500L by losing sight of an L–1011 while in its immediate vicinity, and in thereafter blindly following the controller's clearance, acted in an unairmanlike manner and sealed his fate and that of his passengers, to whom he owed the highest degree of care.

In stating the above we are not unmindful of the rapidity with which these unfortunate events developed: approximately 4 minutes from first contact to crash and about 42 seconds from overtake to crash.

1. Hereinafter "N–500L"

2. Hereinafter "EAL" or "EAL 75"

3. Hereinafter "FAA" or the "controllers", although technically the party defendant is the United States of America.

4. Hereinafter "Air Caribbean."

5. Hereinafter "Cruz."

6. Hereinafter collectively referred to as "Cornhill."

7. Hereinafter referred to as "Corporación Insular."

But this undeniable factor in air transportation only serves to emphasize the duty of pilots and air controllers to exercise their judgment and foresight in such manner as to avoid placing aircraft in situations from which only flawless, split-second timing under stressful conditions can be relied upon to avoid disaster.

In support of our conclusions, and in compliance with Rule 52 of the FRCP, we hereby find and conclude:

## FINDINGS OF FACT

1. On September 26, 1978 at approximately 6:45 P.M., Twin Beech aircraft N–500L being operated as Air Caribbean commuter Flight 309 crashed in the Barrio Obrero section of San Juan, Puerto Rico while on route from Aguadilla, P.R. The pilot and five passengers were killed and there was substantial property damage and personal injury on the ground.

2. The N–500L, crashed as a result of an encounter with wake turbulence which had been generated by an L–1011 type aircraft which was on approach to San Juan International Airport and was denominated EAL Flight 75. Wake turbulence is an aerodynamic phenomenon caused by the movement of an airfoil through the atmosphere. A pair of counter-rotating wing tip vortices, sometimes described as small horizontal tornadoes, are generated behind the aircraft's wings, the intensity of which is governed by the weight, shape and speed of the airfoil. These vortices drift behind and below the flight path of an aircraft, from the direction of the prevailing wind.

3. The weather conditions at San Juan at the time of the crash were good. Visibility was 12 miles, with the lowest layer of clouds at 3,000 feet and scattered. Temperature was 80° F and the surface winds were out of the southeast at 3 knots. Official sunset was 6:17 AST [8] and the end of civil twilight was 6:30 AST. In the clear weather conditions, called VFR conditions, such as those which existed on the night of the accident, pilots are required by regulations to see and avoid each other regardless of the type of clearance they receive from air traffic control. 14 C.F.R. 91.67(a).

4. Jerry Cannon, pilot of the N–500L, EAL 75's crew members and the FAA air traffic controllers were all qualified and currently rated to perform the jobs in which they were functioning on the night of the accident.

5. On the night of the accident, EAL 75 approached the northern coast of Puerto Rico from the ocean on a heading of 125 degrees (southeastbound). At 6:39:18 EAL 75 was told by FAA Air Traffic Control that it was 15 miles from "Condo",[9] that it should continue its 125° heading until it intercepted the localizer course to Runway 10 at SJU, and that it was cleared to perform the Lagoon Approach to SJU. The Lagoon Runway 7 (visual) Approach involves tracking the localizer to Runway 10 until reaching San José Lagoon, which lies at the western edge of the airport, then turning left 30° to line up with Runway 7, and thereafter proceeding visually to land on that runway. The flight data recorder foil taken from EAL 75 reveals that said aircraft intercepted the localizer inbound to the airport, turned left, and eventually landed on Runway 7 in accordance with the published procedure.

6. At all times pertinent to this case N–500L was being flown under visual flight rules (VFR), no flight plan having been filed, and as a commuter flight was subject to Part 135 of the Federal Aviation Regulations (FAR). EAL 75 was being flown on an instrument flight rule (IFR) plan filed with FAA Air Traffic Control, and as scheduled air carrier was subject to Part 121 of the FAR's.

7. Normal procedure for a VFR pilot to SJU for landing requires that the pilot call

---

8. All times given are local Atlantic Standard Time.

9. Condo is an air navigational fix, also known as the "outer marker", located on the localizer course approximately 4 nautical miles west of the threshold of Runway 10 at San Juan International Airport (hereinafter called "SJU").

SJU approach control on the approach control frequency when near Dorado airport, which is 17 miles west of San Juan. The approach controller then sequences the VFR aircraft into the approach sequence and turns it over to local control in the tower cab for ultimate landing clearance.

8. In this case, N–500L's approach frequency was inoperative. The pilot of N–500L called up the local controllers at 6:40:40 and advised them that he was unable to contact approach control but was coming up on Levittown, which is a VFR reporting point approximately ten miles west of San Juan airport. Because the air traffic controller working the local control position in the tower cab was not qualified to handle aircraft in approach control airspace and was not radar qualified, and because the N–500L had called the tower while it was in approach control airspace, the tower cab coordinator stepped in to assist the local controller and communicated with the pilot of N–500L.

9. At this time tower controllers observed on a radar repeater scope that EAL 75 was descending from 3,000 feet, in a position directly behind and 2 miles west of N–500L. At 6:41:15 the pilot of N–500L was advised by the cab coordinator that he had an Eastern Airlines L–1011 aircraft two miles behind him at his six o'clock position,[10] that the airliner was at an altitude of 3,000 ft., and that said aircraft was overtaking him. A heading of 130 degrees (south east) was suggested by the cab coordinator to N–500L.

10. The L–1011 aircraft is a "heavy" aircraft.[11] It is generally known, and should be known by pilots with a reasonable degree of proficiency, that such aircraft generates a dangerous amount of wake turbulence, which any reasonably prudent pilot should attempt to avoid.

10. The clock positions are the common reference positions used by airmen, whereby twelve o'clock, on the horizontal plane, is directly ahead and six o'clock directly behind.

11. See Appendix 3, Page 1 of the Air Traffic Control Manual (Exhibit 7). A "heavy" is an aircraft of more than 300,000 pounds gross weight.

11. At 6:41:23 the pilot of the N–500L acknowledged the cab coordinator's 6:41:15 communication, indicating that he saw EAL 75 ("Yeah, I got him"), whereupon at 6:41:24 the cab coordinator told N–500L to plan to follow EAL 75 and cautioned him about wake turbulence, which again was acknowledged by N–500L at 6:41:28. N–500L however, did not take the suggested 130 degree heading for any significant amount of time, if at all. Had the pilot of N–500L taken the suggested heading for an appropriate length of time, he would have removed himself from the flight path of EAL 75 and would have never encountered the wake turbulence generated by said aircraft.

12. Upon acknowledgment by the pilot of N–500L that he had EAL 75 in sight, and upon instruction from the air traffic controller to "plan to follow" the airliner, visual separation was arranged between N–500L and EAL 75. Visual separation is one of the approved forms of separation by which air traffic controllers may insure that pilots may maintain a safe distance from each other in VFR, clear weather conditions in a Stage III TRSA[12] area such as SJU. A pilot accepting an instruction to follow another aircraft becomes solely responsible for maintaining safe separation from that other aircraft and its wake turbulence. Having arranged visual separation between EAL 75 and N–500L, the cab coordinator was not required to monitor the flight path or actions of the N–500L.

13. At 6:42:31 the approach controller called EAL 75 and advised that the Twin Beech, which had previously been pointed out as unidentified traffic at the 12:30—1:00 o'clock position, was in fact a Twin Beech N–500L inbound to SJU and that it would be following the EAL 75 for landing.

12. The San Juan terminal area is designated as a Stage III terminal Radar Service Area (TRSA) wherein radar controllers are required to provide radar sequencing and separation services for VFR aircraft.

EAL 75 was then advised to switch radio frequency from the approach control to the tower local control frequency. Thereafter, both N-500L and EAL 75 were on the same frequency as the local controller in the tower cab. The cab coordinator ceased assisting the local controller after this point in time.

14. As both aircraft proceeded inbound toward SJU, EAL 75 began to slow its speed from 225 knots initially down to 170 knots, and then slower to 146 knots inside Condo. Although the speed of N-500L is not known with certainty, experts testified that it was flying at approximately 150-160 knots outside of the final approach fix at Condo and at approximately 110 knots inside Condo. Notwithstanding that EAL 75 was overtaking N-500L at Levittown, which is ten miles from the runway, it appears that the closure speed of the two aircraft diminished in such a manner that EAL 75 did not overtake N-500L until approximately one-half mile inside of Condo, at which point EAL 75 had descended to approximately 1,400 feet in compliance with the required glide path for the Lagoon Approach.

15. There is no evidence to indicate that N-500L ever flew above 1,000 feet while approaching the airport. The crew of EAL 75, who had the N-500L in sight throughout most of this incident, estimated that N-500L was consistently at an altitude somewhere between 250-1000 feet above sea level. Although it is difficult to estimate the altitude of a lower aircraft at night, there is no question but that N-500L never flew above 1000 feet while approaching the airport. Operating at this altitude was a violation of Federal Aviation Regulations and a proximate cause of the crash because it placed N-500L below the flight path of the airliner enabling the N-500L to be engulfed by descending wake turbulence.

16. There is no conclusive evidence regarding the exact flight path of N-500L but expert testimony and the testimony of EAL 75's crew indicates that N-500L approached SJU on an easterly course and allowed the EAL 75 to overtake him from above and behind in such a manner that he lost sight of EAL 75 just prior to the overtake. The evidence further indicates that the pilot of N-500L did not maneuver his aircraft out of the path of the airliner in accordance with instructions of the air traffic controller to "plan to follow" the L-1011. His failure to obey this instruction is a violation of Federal Aviation Regulations (14 C.F.R. 91.75) and is negligence. By failing to comply with this instruction, the pilot of N-500L placed his aircraft in dangerous proximity to the path of EAL 75's wake turbulence and this negligent act was a proximate cause of the accident. By failing to maneuver his aircraft in order to keep EAL 75 in sight and maintain visual separation, the pilot of N-500L negligently violated the good operating practices described in the Airman's Information Manual and the Advisory Circular on wake turbulence, and this negligence was a proximate cause of the accident.

17. At 6:44:05, EAL 75 overtook and passed to the right side of N-500L, at a higher altitude while descending. Just before Eastern 75 overtook and passed N-500L on the right side at 6:43:50, the pilot of N-500L called the local controller in the tower cab, and said, "Uh, 500L, I don't have my traffic anymore", meaning that he had lost sight of the EAL 75. This transmission was heard by the crew of EAL 75.

18. At this point the crew of EAL 75 could see N-500L, below, just ahead and to the left of their flight path. From their superior position, looking down on the smaller aircraft, EAL 75 was in the best position, before overtaking to determine whether their wake turbulence would create a hazard for the lower, lighter aircraft. A jump seat rider, who was sitting on the left side of EAL 75 behind the Captain and who was an airline pilot himself, testified that as they overtook and passed N-500L he could see the silhouettes of the passengers in the cabin of the Twin Beech. Prior to, during, and after the overtaking the air traffic control radar showed that the targets of EAL 75 and N-500L were merged, creating the impression that the aircraft may have been close together.

19. Based on the observations of the jump seat rider and the merger of target symbols, the Court concludes that EAL 75 passed so close to N–500L as to create a wake turbulence hazard to it. The failure of EAL 75 to change its flight path so as to pass well clear of the overtaken aircraft was negligence and a proximate cause of the crash.

20. At 6:43:57, seven seconds after being told by N–500L that it lost its traffic, the local controller advised the pilot of N–500L, "Twin Beech 500L, continue approach for runway 10". At 6:44:30, N–500L acknowledged, "OK, one zero."

21. At the time the local controller told the pilot of N–500L to continue his approach to Runway 10, the air traffic controller did not have the pilot of aircraft N–500L in sight either visually or by reference to his radar repeater scope in the tower. Furthermore, the controller made no attempt to establish the relative positions of the two aircraft by various means at his disposal such as asking EAL 75 the position of N–500L, requesting N–500L to state his position or flash his landing lights, or by scanning the area with binoculars. In fact the only thing that was done by the local controller before issuing the "continue approach" clearance was to look with the naked eye in the general direction of EAL 75.

22. The failure of the local controller to take adequate steps to locate the position of N–500L with relation to the EAL "heavy", and the issuance of a clearance which, under the circumstances, was ambiguous because it gave the impression that he knew where N–500L was vis-a-vis EAL 75, and that they were safely separated, was negligence and a proximate cause of the accident.

23. The wake turbulence encounter by N–500L occurred at approximately 6:44:45. Thus, 48 seconds lapsed between the time the air traffic controller gave the "continue approach" clearance to the N–500L pilot and the actual encounter with the wake turbulence, and 40 seconds elapsed between the time of the overtake and the time of the wake turbulence encounter. The evidence shows that at some time within 20 seconds after N–500L was overtaken by EAL 75, the pilot of the small aircraft should have seen the airliner through prudent scanning techniques. There is also evidence to prove that between 20 and 40 seconds after the overtaking, the pilot of N–500L should have seen EAL 75 even if he was sitting erect in the cockpit and not turning his head or craning his neck to try and locate the airliner. The L–1011 was described by one witness as a "flying condominium", and EAL 75 was lit up by wing tip navigation lights, high intensity strobe lights, red flashing rotating beacons, as well as landing lights and the passenger cabin lights.

24. This Court finds that after the overtaking the pilot of N–500L should have seen EAL 75 and was in the best position to visualize the vortex trail behind the airliner. The Court finds that the pilot of N–500L was responsible, in the VFR flight conditions which existed on the night of the accident, to visualize and to avoid wake turbulence of EAL 75. By continuing into the flight path of EAL 75 the pilot of N–500L was negligent and this negligence was a proximate cause of the crash.

25. The failure of the local controller to provide any assistance to the pilot of N–500L after he negligently lost his traffic, did not relieve the pilot, who was in the best position to help himself, of the primary responsibility he had to maintain visual separation and to visualize and avoid wake turbulence of EAL 75.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and by reason of the diversity of citizenship of the parties, 28 U.S.C. § 1332(a).

2. Pursuant to the pertinent provisions of the Federal Tort Claims Act, the substantive law of the Commonwealth of Puerto Rico governs in this case, in that San Juan and Carolina are the places where the

alleged acts or omissions of negligence took place. 28 U.S.C. § 1346(b).

3. Under the law of Puerto Rico, for a negligent act to be a proximate cause of injury, it is necessary that the Defendant foresee that his act could cause injury. The party charged with negligence may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of the party's act or omission. It is unnecessary that the Defendant should have anticipated the very injury complained of or anticipated that it would have happened in the exact manner in which it did. *Ginés v. Aqueduct and Sewer Authority*, 86 P.R.R. 490, 497 (1962).

4. The Federal Aviation Regulations (FAR) which are published in Title 14 of the Code of Federal Regulations have the force and effect of law. *Tilley v. United States*, 375 F.2d 678 (C.A. 4, 1967).

5. Violations of the Federal Aviation Regulations (Title 14 CFR) are negligence *per se*. *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443 (C.A. 3, 1968); *Ramos Oppenheimer v. LeDuc*, 103 D.P.R. 342, 345 (1975).

6. The Airman's Information Manual is a quarterly safety publication of the Federal Aviation Administration which explains basic fundamentals required of any pilot who flies in the national airspace system and is evidence of the standard of care for all pilots in the aviation community. *Associated Aviation Underwriters v. United States*, 462 F.Supp. 674, 680 (N.D.Tex., 1979).

7. The information contained in FAA Advisory Circulars, particularly the AC–90–23 series concerning the nature, behavior, and danger of wake turbulence, is chargeable to all certificated pilots and is evidence of the standard of care for determining whether they exercise proper wake turbulence avoidance procedures. *Muncie Aviation Corp. v. Party Doll, Inc.*, 519 F.2d 1178, 1181 (C.A. 5, 1975); *Thinguldstad v. United States*, 343 F.Supp. 551 (S.D. Ohio, 1972).

8. The pilot in command of an aircraft is directly responsible for and is the final authority as to the operation of that aircraft. 14 C.F.R. § 91.3(a); *Delta Airlines Inc. v. United States*, 561 F.2d 381, 385 (C.A. 1, 1977).

9. A public air carrier such as Air Caribbean is responsible for exercising the highest degree of care toward its passengers. 49 U.S.C. § 1421(b); *Muñoz v. New York and Puerto Rico S. S. Co.*, 72 P.R.R. 543 (1951).

10. During Visual Flight Rule (VFR) weather conditions pilots must see and avoid each other regardless of the type of clearance under which they are operating. 14 C.F.R. 91.67(a); *Wenninger v. United States*, 234 F.Supp. 499 (D.Del.1964), affirmed 352 F.2d 523 (C.A. 3, 1965).

11. Under Visual Flight Rule (VFR) weather conditions the pilot's duty to see and avoid other aircraft also includes the requirements that he exercise the same degree of caution to visualize and avoid wake turbulence encounter with other aircraft. 14 C.F.R. 91.65(a); 14 C.F.R. 91.-67(a); Airmen's Information Manual Part 1, pp. 108–109 (1978); FAA Advisory Circular 90–23D (1972), and *Wasilko v. United States*, 300 F.Supp. 573 (N.D. Ohio 1967) affirmed 412 F.2d 859 (C.A. 6, 1969).

12. In clear weather conditions the pilots, not the air traffic controllers, bear the primary responsibility to visualize and avoid the hazard of wake turbulence. *Kack v. United States*, 570 F.2d 754, 756 (C.A. 8, 1978), affirming *Kack v. United States*, 432 F.Supp. 633 (D.Minn.1977).

13. The function of avoiding wake turbulence in VFR is primarily the responsibility of the pilot because he is in the best position to visualize the location of the vortex trail generated by large or heavy aircraft and maneuver his aircraft as necessary to avoid it. *Sanbutch Properties, Inc. v. United States*, 343 F.Supp. 611, 615 (N.D. Cal., 1972); *Richardson v. United States*, 13 CCH Avi. 17,392, 17,395 (N.D.Cal.1974).

14. Air traffic controllers are required to comply with the mandatory provisions of their Air Traffic Control Manual, FAA Order 7110.65A, to provide for the safe, orderly and expeditious flow of traffic. 14 C.F.R. 65.45(a). The Air Traffic Control Manual instructs air traffic controllers to exercise their best judgment in situations not covered by the Air Traffic Control Procedures Manual.

15. Pilots of all aircraft have a duty to visualize the location of the vortex trail behind a large aircraft and utilize proper vortex avoidance procedures to avoid a wake turbulence encounter. It is equally important that the pilots of large aircraft plan or adjust their flight paths to minimize vortex exposure to other aircraft. Airman's Information Manual Part 1, pp. 108–09 (July 1978). Pilots are responsible for the foreseeable damage that is caused by the wake turbulence generated by their aircraft.

16. When air traffic is pointed out to a pilot and he acknowledges seeing it and then receives instructions to follow a heavy jet aircraft in VFR conditions and acknowledges receipt of these instructions, a duty is created on the part of the pilot to visually separate himself from the heavy jet aircraft's wake turbulence and to maneuver his aircraft as necessary to avoid the wake turbulence. Airman's Information Manual Part 1, pp. 54, 81 (July 1978); FAA Advisory Circular 90–23D p. 17 (15 Dec. 1972).

17. A pilot has a continuing duty in visual flight conditions (VFR) to be aware of danger when, with his own eyes, he can perceive the danger through normal scanning-techniques. *Spaulding v. United States*, 455 F.2d 222 (C.A. 9, 1972) affirming 299 F.Supp. 1116 (C.D.Cal.1969); *Thinguldstad v. United States*, 343 F.Supp. 551, 558 (S.D. Ohio E.D.1972).

18. All aircraft have blind spots, that is, areas in which the aircraft's structure prevents the pilot from seeing. Before a pilot turns or otherwise travels into an area obscured by a blind spot, he has a duty to clear that area by banking or turning the aircraft slightly and by moving his head or upper body so as to look around or over the obscuring portion of the aircraft's structure. The existence of so-called "blind spots" or areas of partial obstruction do not excuse a pilot from his duty to see and avoid other aircraft pursuant to the federal aviation regulations. *United States v. Miller*, 303 F.2d 703, 709 (C.A. 9, 1962).

19. A tower air traffic controller is required to warn a pilot of a danger which is not readily apparent to the pilot but which should be reasonably apparent to the air traffic controller. *Dickens v. United States*, 378 F.Supp. 845 (S.D.Tex.1974).

20. The pilot of N–500L negligently failed to take the heading of 130° suggested by air traffic control for a sufficient amount of time, thus violating the highest duty of care he owed to his passengers. Had the pilot of N–500L complied with air traffic control's suggested heading until such time as EAL 75 had passed it to its left, N–500L would never have been in a position to encounter the wake turbulence of the airliner and thus his failure to comply with air traffic control's instruction was a proximate cause of the crash. *Muñoz, supra.*

21. By flying his Twin Beech below 1000 feet, over a congested area, the pilot of N–500L violated Federal Aviation Regulations (14 C.F.R. 91.79) and negligently put himself in a position below the flight path of the airliner, thus encountering the descending wake turbulence. This negligence was a proximate cause of the accident. 14 C.F.R. 91–79(b).

22. The pilot of N–500L failed to prudently comply with an air traffic control instruction, to wit "plan to follow" the L–1011, and "caution—wake turbulence." His failure to follow these air traffic control instructions was negligence *per se* and a proximate cause of the crash. 14 C.F.R. 91.75(b); *Jenrette v. United States*, 14 CCH Avi. 17,798 (N.D.Cal.1974).

23. Having assumed the duty of providing his own visual separation in a

Stage III Terminal Radar Service Area (TRSA), the pilot of N–500L was negligent in failing to maneuver his aircraft in VFR to keep the airliner in sight so as to maintain visual separation. By losing sight of the airliner just before the critical time at which the airliner overtook N–500L, the pilot of N–500L put himself dangerously close to the wake turbulence of the L–1011, such that he violated his responsibilities as pilot-in-command to his passengers to maintain the highest degree of care and his breach of this duty was a proximate cause of the crash. *Jenrette v. United States,* 14 CCH Avi. 17,798 (N.D.Cal.1974); 14 C.F.R. 91.3, 91.67(a); Advisory Circular 90–23D (1972); Airman's Information Manual Part 1, pp. 54, 81 (1978).

■ 24. The pilot of N–500L negligently failed to comply with his duties of pilot-in-command to take evasive action when he saw or should have seen that the airliner had overtaken him and was descending in front of him. In this situation he was in the best position to avoid wake turbulence, but he failed to take prudent action to maneuver his aircraft away from the path of the airliner, and instead he flew his aircraft into the wake of the airliner such that he lost control and proximately caused the crash. 14 C.F.R. 91.3; 14 C.F.R. 91.67(a); *Jenrette v. United States,* 14 CCH Avi. 17,798 (N.D.Cal.1974); *Richardson v. United States,* 13 CCH Avi. 17,392 (N.D.Cal. 1974).

■ 25. Pilots are responsible for the foreseeable consequences of wake turbulence generated by their aircraft. The crew of EAL 75 had a duty to avoid creating a wake turbulence hazard for N–500L, but they breached that duty by negligently failing to comply with the good operating practices found in the Airman's Information Manual which advises pilots of large aircraft to plan or adjust their flight paths to minimize vortex exposure to other aircraft. This negligence was a proximate cause of the crash. Airman's Information Manual Part 1, p. 108 (July, 1978).

■ 26. The issuance of the instruction "continue your approach to runway 10" by the air traffic controller after the pilot had told the tower that he had lost sight of his traffic, was a confusing clearance to the pilot, particularly since the controller did not have the pilot in sight and the pilot may have been led to believe that it was safe for him to continue toward Runway 10, when in fact the controller should have known that the airliner had laid down wake turbulence in-between the pilot and the runway. The issuance of this clearance seconds after the pilot said that he had lost his traffic was a violation of the controller's duty to exercise his best judgment and was a proximate cause of the crash. Air Traffic Control Manual, Order 7110.65A. Forward P. 1 (1978).

■ 27. When the pilot of N–500L announced that he no longer had his traffic in sight, the local controller failed to exercise the best judgment required under the Air Traffic Control Manual by his failure to take action to locate the position of N–500L in relation to the airliner and advise the pilot so that the pilot would be aware of the exact location of the wake turbulence hazard. This omission was negligence and a proximate cause of the crash. Air Traffic Control Manual, Order 7100.65A, Forward P. 1 (1978).

■ 28. Based upon all of the evidence and these findings of fact and conclusion of law, the Court finds each that Defendants' negligence caused or contributed substantially to causing the accident in the following percentages:

    a. N–500L _____60%
    b. FAA _____20%
    c. EAL _____20%

## OTHER MATTERS

EAL and the FAA have conceded that the insurers of N–500L are not liable for the claims arising out of the death of the pilot of N–500L, nor the damages sustained by its owner. Therefore, the total sum of $345,000.00 paid by EAL and the FAA to his estate will be deducted from the total amounts of the settlements ($5,690,000.00). The Clerk of this Court is thus directed to

enter Judgment in favor of EASTERN AIR LINES, INC. and the UNITED STATES OF AMERICA and against Cornhill Insurance Company, Ltd., representing certain Underwriters at Lloyds, London, and Corporación Insular de Seguros, jointly and severally, in the amount of $3,207,000.00. The Court retains jurisdiction to consider EAL's and the FAA's claims for costs and attorneys' fees incurred as a result of the alleged recalcitrance or obstinance of N–500L's insurers during pendency of these cases.

IT IS SO ORDERED.